TEXAS CO. v. HENRY.

No. 1551.    Opinion Filed August 20, 1912.

(126 Pac. 224.)

1. INDIANS—Indian Lands—Alienation—Treaties. The allotments of minor Creek Indians were made inalienable by section 4 of the treaty of March 1, 1901 (31 St. at L. 861), and continued so, where the infancy continued, until the passage of Act Cong. May 27, 1908, c. 199, 35 St. at L. 312.

2. SAME—Allotment to Minor Creeks—Easements—Grant by Secretary of Interior. It is lawful for Congress, acting as parens patriae of a minor Creek Indian, whose allotment contains restrictions against alienation, to enact a law conferring upon the Secretary of the Interior authority to grant a right of way in the nature of an easement for the construction, operation, and maintenance of pipe lines for the conveyance of oil and gas through such allotment, upon such terms and for such compensation as may be fixed; due consideration at all times being had for the interest of the minor allottee.

3. CONSTITUTIONAL LAW—Indians—Due Process of Law—Indian Lands—Right of Way—Statutes. Act Cong. March 11, 1904, c. 505, 33 St. at L. 65 (U. S. Comp. St. Supp. 1911, p. 715), in so far as it authorizes the Secretary of the Interior to grant a right of way in the nature of an easement for the construction, operation, and maintenance of pipe lines for the conveyance of oil and gas through lands which have been allotted in severalty to any individual Indian under any law or treaty, but which has

not been conveyed to the allottee with full power of alienation, is not subject to the objection that it is in violation of the fifth amendment to the federal Constitution.

(a) The right of the Secretary of the Interior to extend such grant for an additional term, not being involved, is not considered.

4. **INDIANS—Indian Lands—Easement—Compensation—Benefit to Indian.** Occupying the position that the federal government does in its guardianship over the Creek Indians, and its obligation to protect them in their property and personal rights, it cannot be said that Act March 11, 1904, pursuant to which an allottee, through her legal guardian, received $892.50 cash for a twenty-year easement on 11.9 acres of land, was not in the interest of or beneficial to such allottee, but, instead, was wholly in the interest of companies engaged in piping oil and gas through the Indian Territory, though such act was primarily for the benefit of such companies.

(Syllabus by Sharp, C.)

*Error from District Court, Okmulgee County;*
*W. L. Barnum, Judge.*

Action by Mintie Henry against the Texas Company. Judgment for plaintiff, and defendant brings error. Reversed and rendered.

*Carroll & Walker* and *Amos L. Beaty,* for plaintiff in error.

*William M. Matthews,* for defendant in error.

Opinion by SHARP, C. It is stipulated by counsel that the only question presented for determination by this appeal is whether or not the act of Congress of March 11, 1904 (33 St. at L. 65, c. 505 [U. S. Comp. St. Supp. 1911, p. 715]), is void, in that it violates the fifth amendment to the Constitution of the United States. The act follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the Secretary of the Interior is hereby authorized and empowered to grant a right of way in the nature of an easement for the construction, operation, and maintenance of pipe lines for the conveyance of oil and gas through any Indian reservation, through any lands held by an Indian tribe or nation in the Indian Territory, through any lands reserved for an Indian agency or Indian school, or for other purpose in connection with the Indian service, or through any lands which have been allotted in severalty to

any individual Indian under any law or treaty, but which have not been conveyed to the allottee with full power of alienation, upon the terms and conditions herein expressed. No such lines shall be constructed across Indian lands, as above mentioned, until authority therefor has first been obtained from, and the maps of·definite location of said lines approved by, the Secretary of the Interior: Provided, that the construction of lateral lines from the main pipe line establishing connection with oil and gas wells on the individual allotments of citizens may be constructed without securing authority from the Secretary of the Interior and without filing maps of definite location, when the consent of the allottee upon whose lands oil or gas wells may be located and of all other allottees through whose land said lateral pipe lines may pass has been obtained by the pipe line company: Provided further, that in case it is desired to run a pipe line under the line of any railroad, and satisfactory arrangements cannot be made with the railroad company, then the question shall be referred· to· the Secretary of the Interior, who shall prescribe the terms and conditions under which the pipe line company shall be permitted to lay its lines under said railroad. The compensation to be paid the tribes in their tribal capacity and the individual allottees for such right of way through their lands shall be determined in such manner as the Secretary of the Interior may direct, and shall be subject to his final approval. And where such lines are not subject to state or territorial taxation the company or owner of the line shall pay to. the Secretary of the Interior, for the use and benefit of the Indians, such annual tax as he may designate, not exceeding five dollars for each ten miles of line so constructed and maintained under such rules and regulations as said Secretary may prescribe. But nothing herein contained shall be so construed as to exempt the owners of such lines from the payment of any tax that may be lawfully assessed against them by either state, territorial, or municipal authority. And incorporated cities and towns into and through which such pipe lines may be constructed shall have the power to regulate the manner of construction therein, and nothing herein contained shall be so construed as to deny the right of municipal taxation in such towns and cities, and nothing herein shall authorize the use of such right of way except for pipe line, and then only so far as may be necessary for its construction, maintenance, and care: Provided, that the rights herein granted shall not extend beyond a period of twenty years: Provided further, that the Secretary of the Interior, at the expiration of said twenty years, may extend the right to maintain any pipe line constructed under this act for

another period not to exceed twenty years from the expiration of the first right, upon such terms and conditions as he may deem proper."

The lands in controversy were allotted to Anna May Henry, duly enrolled as a one-eighth blood Creek Indian, in the year 1901, as a part of her surplus allotment. Patent thereto was issued April 14, 1903, and was approved by the Secretary of the Interior on May 8th of said year. Until March 15, 1909, said Anna May Henry was a minor, under the age of eighteen years.

Plaintiff in error, by its answer, set up title to the lands in controversy, acquired by it pursuant to the provisions of the act of Congress of March 11, 1904, and of the regulations theretofore promulgated by the Secretary of the Interior, under and by virtue of said act; that it was at the time conducting a pipe line in the Indian Territory for the transportation of oil through said territory into the state of Texas; that in order to construct, maintain, and operate its said pipe line the said defendant, in the month of February, 1907, required about 16.07 acres of land near the town of Henryetta, Okla., upon which to lay its pipe line and erect its pumping station, for the pumping of oil, and tanks for receiving and distributing oil, all of which were necessary in the operation of its said pipe line, and were essential parts thereof; that its said application and maps, made in pursuance of and for the purpose named, were on the 14th day of March, 1907, duly approved by the Secretary of the Interior; that thereafter the said Secretary of the Interior duly caused to be assessed the damages due said Anna May Henry for the lands aforesaid, the amount thereof being fixed at $75 per acre, which, it charged, was a full and liberal compensation; that said assessment was duly approved by the Secretary of the Interior, August 22, 1907, and the amount thereof paid through the United States Indian agent to Hugh Henry, the father and legal guardian of said Anna May Henry, who was then and there a minor, the total amount paid being $892.50; that said sum of money was accepted and retained by said guardian, and that thereupon, in accordance with the provisions of the said act, defendant was in terms granted by the Secretary of the Interior, and became entitled to the use and

possession of, said lands for the full period of twenty years from and after the 14th day of March, 1907, for the purpose of laying, maintaining, and operating thereon and thereover its pipe line, including its pumping stations, tanks for receiving and distributing oil, and such other erections, structures, machinery, and fixtures as were proper and necessary in the due operation and maintenance of the same; that defendant has in all things complied with all of the laws then and now in force, and has erected on said premises improvements of the aggregate value of $50,000.

On the 18th day of March, 1909, by warranty deed, Anna May Henry conveyed the lands in question to the defendant in error, Mintie Henry.

A demurrer was sustained to the second paragraph of the answer, pleading title in the plaintiff in error, acquired under and by virtue of the said act of Congress. Upon the issues remaining, the case was tried by the court below upon an agreed statement of facts, and judgment rendered for the plaintiff below.

We shall first consider the legal status of Anna May Henry in the year 1907, with a view of determining whether she was during said year *sui juris*. It is insisted by counsel for defendant in error that all restrictions on the allottee's right of alienation expired by limitation not later than August 8, 1907, and which was prior to the time when the damages assessed by the Secretary of the Interior were paid to the allottee through the office of the Indian agent; that at the time of the taking of the land all restrictions thereon had been removed; that the allottee not only had the patent, conferring the fee-simple title, but was also a citizen of the United States. Counsel have, however, either overlooked or failed to give proper heed to section 4 of the original Creek Treaty (31 St. at L. 861) of March 1, 1901, which provides:

"The allotment for any minor may be selected by his father, mother, or guardian, in the order named, and shall not be sold during his minority. All guardians or curators appointed for minors and incompetents shall be citizens."

In *Jefferson v. Winkler*, 26 Okla. 653, 110 Pac. 755, this court held that none of the restrictions on the alienation of any

part of the lands allotted to minor Creek citizens were removed until the passage by Congress of Act May 27, 1908, c. 199, 35 St. at L. 312. The restriction period, therefore, that expired by limitation as to certain classes of adult Creek citizens on August 8, 1907, did not include the allottee, for as to her there attached the additional legal disability of infancy. Therefore the particular step of the proceedings with reference to the acquiring of the lands that may have existed on August 8, 1907, for the reason named, becomes immaterial, as it is not denied that whatever rights plaintiff in error may have acquired were completed during the year 1907, and long anterior to the date at which the said allottee reached her majority. Therefore, at the time that plaintiff in error acquired its rights, the allottee did not possess and enjoy such a title to her allotment as gave her the right of alienation.

The language of the act in question, affecting the rights of defendant in error, is:

"Or through any lands which have been allotted in severalty to any individual Indian, under any law or treaty, but which have not been conveyed to the allottee with full power of alienation."

It is not deemed necessary to consider at length the position which the federal government has occupied toward the Five Civilized Tribes of Indians. From the beginning to the present time they have been treated as "wards of the nation," "in a state of tutelage," "dependent political communities," holding such relations to the general government that they and their country, as was declared by Chief Justice Marshall in *Cherokee Nation v. Georgia,* 5 Pet. 1, 8 L. Ed. 25, in speaking of the Cherokees, "are considered by foreign nations as well as by ourselves as being so completely under the sovereignty and dominion of the United States that any attempt to acquire their lands, or form a political connection with them, would be considered by all as an invasion of our territory and an act of hostility." Nor has this right of guardianship ceased altogether by reason of the recent allotment· of the lands of the Creek Indians.

In *Heckman et al. v. United States,* 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820, decided April 1, 1912, it was said:

"While we have recognized these tribes as dependent nations, the government has likewise recognized its guardianship over the Indians, and its obligations to protect them in their property and personal rights"

—referring to the treaty provisions with the Cherokees made in 1846. Attention was there called to the fact that during the continuance of the guardianship the right and duty of the nation to enforce by all appropriate means the restrictions designed for the security of the Indians could not be gainsaid. It was further observed that, while relating to the welfare of the Indians, the maintenance of the limitations which Congress had prescribed as a part of its plan of distribution is distinctly an interest of the United States, and that out of its peculiar relations to these dependent people sprang obligations, to the fulfillment of which the national honor had been committed; that by reason of their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it had been promised, there arose the duty of protection, and with it the power. This had always been recognized by the executive, and by Congress, and by the Supreme Court whenever the question had arisen. It was further said:

"Not only was the United States entitled to prosecute this suit by virtue of the interest springing from its peculiar relations to the Indians and the course of dealing which had finally led to the plan of separate allotments, accompanied by restrictions for the protection of the allottees, but Congress has explicitly recognized the right of the government thus to enforce these restrictions, and has made appropriation for the maintenance of suits of this description."

It was further observed, replying to the objection that there was a defect of parties on account of the absence of the Indian grantors:

"There can be no more complete representation than that on the part of the United States in acting on behalf of these dependents, whom Congress, with respect to the restricted lands, has not yet released from tutelage. Its efficacy does not depend upon the Indians' acquiescence. It does not rest upon conven-

tion, nor is it circumscribed by rules which govern private relations. It is a representation which traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care, and it recognizes no limitations that are inconsistent with the discharge of the national duty."

The case is one that reviews at length both the early and later opinions of that court, and is particularly instructive, as well as controlling, upon the question that the federal government, due to the mere fact of the allotment of the lands of the Five Civilized Tribes, among the respective members of the different nations, has not thereby surrendered, but, on the contrary, still retains, full control and jurisdiction over allotted lands conveyed in violation of either the treaty provisions or acts of Congress under which allotments were taken. So that it may not be said that the plenary power of the general government has ceased, but instead exists, at least during the full restrictive period. Instead of the authority being relaxed, it has been extended. In fact, Congress, in pursuance of the long-established policy of the government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease. *Tiger v. Western Investment Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738.

Is the act in question, then, subject to the objection that private property shall not be taken for public use without just compensation and without due process of law? Anna May Henry, at the time of the taking, was not *sui juris.* In addition to the legal disability of infancy, her allotment was inalienable without the aid of Congressional enactment, and her title thereto could have been divested in no other manner. But the sovereignty that created the limitation on the right of alienation also had the power to remove it at will, so long as no Constitutional inhibition was violated. By the act in question the Secretary of the Interior was given the power to grant a right of way in the nature of an easement over her lands; full authority being given said officer to fix the compensation to be paid to individual allottees. No attempt was made to extend this authority to alienable allotted lands. Counsel for defend-

ant in error does not deny, but rather concedes, the power of a Legislature, acting as a guardian and protector of those persons laboring under a disability, to constitutionally pass laws under which disposition of their property may be made, where it is done primarily for the purpose of protecting or preserving the estates of those who are persons not *sui juris,* but says that the act in controversy is not of the character contemplated by law in such cases, but that, on the other hand, it was one passed for the benefit of pipe line companies, and not for those under legal disability. We shall direct our attention to this question.

In *Hoyt v. Sprague,* 103 U. S. 613, 26 L. Ed. 585, speaking with reference to a special act of the Legislature of Rhode Island, the Supreme Court said:

"The exercise of this power has been most conspicuous in that class of cases in which the Legislature has been called upon to act as *parens patriae* on behalf of lunatics, minors, and other incapacitated persons. Laws authorizing the sale of the estates of such persons have frequently been passed, and have been upheld as fairly within the legislative power. The passage of such laws is not the exercise of judicial power, although by general laws the discretion to pass upon such cases might be confided to the courts. But when it is not confided to the courts, the power exercised is of a legislative character; the Legislature making a law for the particular case. In some modern Constitutions the exercise of this power has been prohibited to the legislative department. But where not so prohibited, and where it has never been authoritatively condemned in the jurisprudence of the state, we cannot deny to the Legislature the right to exercise it in those cases in which it has been accustomed to be exercised."

In *Watkins v. Holman,* 16 Pet. 25, 10 L. Ed. 873, an act authorizing an administratrix residing in another state to sell land in Alabama for the purpose of paying debts, was held by the Supreme Court to be within the legislative power and valid.

In *Louisville, N. O. & Texas Ry. Co. v. Blythe,* 69 Miss. 939, 11 South. 111, 16 L. R. A. 251, 30 Am. St. Rep. 599, it was said:

"The doctrine is firmly established by the great weight of American decisions, and sustained by the most cogent and unanswerable reasoning, .that special acts of the Legislature authorizing or confirming the sale of lands by guardians are con-

stitutional, when their object is simply to provide a change of investment, and not to divest the beneficiary of property rights, in the absence of special or exceptional constitutional limitations, and that such acts are not judicial, but the proper exercise of legislative power. Such a power necessarily resides in the legislative department of the government, as *parens patriae,* to prescribe such rules and regulations as may be proper for the management, superintendence, and disposition of the property of infants, lunatics, and persons who are incapable of managing their own affairs."

In *Davison v. Johonnot et al.,* 7 Metc. (Mass.) 388, 41 Am. Dec. 448, it was said:

"The statutes in these cases, it will be perceived, were obnoxious to the same objection now urged against the resolve before us. They were legislating for a particular case, dispensing with the general standing law in favor of an individual, and changing the legal title to real estate, taking it from one man and vesting it in another, without judicial sentence or judgment by his peers."

The court further said:

"After much reflection upon the subject, we are not satisfied that the Legislature, in passing this resolve, transcended its constitutional powers. The act was not a judicial one. The proceeding does not deprive the party of his property. The only effect was to change his estate from real to personal assets; the legal interest in the property, or the avails thereof, being wholly secured for his benefit. It was an act passed by the Legislature upon the application of Davison's guardian, the person whom the law had placed as the legal representative to watch over and protect the interest of the ward, and must be assumed to have been done, not adversely to his interest, but for his benefit."

The leading case, referred to in almost all of the decisions on this subject, is that of *Rice v. Parkman,* 16 Mass. 326, where it was held that the Legislature had authority to pass an act licensing the sale of real estate of a minor, and that notwithstanding there was a general act delegating the same power to the courts. The opinion of the court was by Parker, C. J., and it was held that the power thus exercised was not judicial, that the only object of the authority granted by the Legislature was to transmute real into personal estate, for purposes beneficial to all who were interested therein, and that it was the use of a pa-

rental or tutorial power. This power, it was held, must rest in the Legislature of the. commonwealth; that body being alone competent to act as the guardian and protector of those who are disabled to act for themselves.

In *Todd v. Flournoy's Heirs,* 56 Ala. 99, 28 Am. Rep. 758, it was insisted that the act of the Legislature relating to the sale of the estate of the testator, Flournoy, was in violation of the Constitution and void. But the court said:

"The bottom idea in this class of cases seems to be this: Where, by the law of the land, the provisions of which depend on the Legislature, certain persons, because of defect of understanding, immaturity, or some legal disability, are held to be incapable of disposing of their property, and, by reason of supervening circumstances, are hindered from having as beneficial use of it, in its existing shape or condition, as the donors or grantors intended they should have, and in consequence of the trusts, limitations, or other provisions attending the gift or grant of it, the courts cannot afford relief, in such cases the Legislature, representing the state, the general guardian of all, may justly interpose by a special enactment, and authorize the property to be disposed of, or converted, for the benefit of such persons, provided they themselves might so dispose of it, if *sui juris.*"

The great weight of authority sustains this class of legislation when properly confined. *Carroll v. Lessee of Olmstead,* 16 Ohio, 251; *Kneass' App.,* 31 Pa. 91; *Linsley v. Hubbard,* 44 Conn. 109, 26 Am. Rep. 431; *Bronham v. Davidson,* 51 Cal. 352; *Williamson v. Williamson,* 3 Smedes & M. (Miss.) 715, 41 Am. Dec. 636; *McComb v. Gilkey,* 29 Miss. 146; *Boon v. Bowers,* 30 Miss. 246, 64 Am. Dec. 159; *Clark v. Van Surlay,* 15 Wend. (N. Y.) 436; *Cochran v. Van Surlay,* 20 Wend. (N. Y.) 365, 32 Am. Dec. 570; *Leggett v. Hunter,* 19 N. Y. 445; *Trustees, etc., v. Davis,* 31 N. Y. 591; *Brevoort v. Grace,* 53 N. Y. 246; *Stewart v. Griffith,* 33 Mo. 13, 82 Am. Dec. 148; *Garnett v. Leonard,* 47 Mo. 206; *Hindman v. Piper,* 50 Mo. 294; *Thomas v. Pullis,* 56 Mo. 211; *Clusky v. Burns,* 120 Mo. 567, 25 S. W. 585.

Counsel for defendant in error relies upon *Jones v. Perry,* 10 Yerg. 59, 30 Am. Dec. 430, *Powers v. Bergen,* 6 N. Y. 358, *In re Opinions of the Judges,* 4 N. H. 565, *Lane v. Dorman,* 3 Scam. (Ill.) 238, 36 Am. Dec. 543, and *Lincoln v. Alexander,* 52 Cal.

482, 28 Am. Rep. 639, as sustaining his contention. The former case involved the construction of a special statute of the state of Tennessee, which the court interpreted to adjudicate and determine the question of the debts for which the land was contracted to be sold, and accordingly held the statute unconstitutional, on the ground that it was in this respect the exercise of judicial power. In *Lane v. Dorman, supra,* the statute expressly adjudicated a debt in favor of a particular creditor and directed a sale of a minor's land for its payment. The court characterized the statute, for this reason, as in the nature of a judicial decree. The New Hampshire case squarely denied the power of the Legislature to act in such cases. In *Powers v. Bergen,. supra,* no reason appeared for the sale of the land, and the court said that existence of such necessity would not be presumed, when the facts which would create it are neither shown by proof nor recited in the statute. The case is distinguished in *Leggett v. Hunter,* 19 N. Y. 454, where the statute was upheld.

Many of the authorities cited, as well as additional ones, are to be found in *Tuttle v. Moore,* 3 Ind. T. 712, 64 S. W. 585, where the court, speaking through the late Judge Townsend, said:

"The relations of these Indians to the United States has frequently been decided as that of wards to a guardian, and that Congress, by its legislation, can take whatever steps it sees fit to protect and care for these wards of the nation; and if, in the judgment of Congress, it deems it for the best interests of these Indians to sell and dispose of part of their real estate for townsite purpose, there can be no question of their power and authority to do so. Such power has been exercised by the legislation of the states and by the legislation of Congress over all classes of dependents, such as infants, lunatics, minors, and people in like condition. In *U. S. v. Boyd* (C. C.) 68 Fed. 581, the court, referring to the United States, said: 'They appear as sovereign of this dependent Indian community, as *parens patriae* of this helpless and injured race, not yet invested with the full rights of American citizenship, and as guardian, by treaty obligations, of these ignorant and injudicious wards, to control their transactions about lands acquired by the treaty money, and the charitable trust funds bestowed by Congress upon a political depart-

ment of the government to be applied for the benefit of these Indian *cestuis que trustent.'* "

While the facts in the foregoing case were different from the one at bar, there is no distinction in the underlying principle involved. It is in full harmony with the great weight of authority on the right of the lawmaking body in such cases, and as the interests in this case became fixed prior to statehood, and in the Indian Territory, the opinion is one entitled to great weight and consideration. The right is referred to by Cooley, in his work on Constitutional Limitations (7th Ed., p. 146), as follows:

"This species of legislation may perhaps be properly called prerogative remedial legislation. It hears and determines no rights; it deprives no one of his property. It simply authorizes one's real estate to be turned into personal, on the application of the person representing his interest, and under such circumstances that the consent of the owner, if capable of giving it, would be presumed. It is in the nature of the grant of a privilege to one person, which at the same time affects injuriously the rights of no other."

The rule is also recognized in Tiedeman's State and Federal Control of Persons and Property, sec. 138.

The act in question was but the placing in the hands of the Secretary of the Interior of an authority similar to that then authorized and exercised by that officer in the matter of the sale, and in certain cases the leasing, of nonalienable allotted lands. The act does not undertake to divest the allottee of the title, but to authorize the granting of an easement or a servitude whereby a pipe line company might enjoy some profit or beneficial use out of the estate of the allottee. Keeping in mind the relation of the general government toward those of its citizens whom it ever has regarded in law as dependents, and the additional fact that in the present case the lands were nonalienable, and that pursuant to the provisions of the statute the guardian of the allottee received $892.50 in cash for a twenty-year easement on 11.9 acres of land, we cannot infer that the general government was unmindful of and failed to discharge its duty in the premises. Rather must we give sanction to the belief that the act was for the benefit of both pipe line companies and al-

lottees, and that without reference to the public good, in which, in a measure, all shared. It is a well-known fact that all allottees of the Creek Nation received 160 acres of land each, and we may not lose sight of the fact that the construction of these pipe lines from the oil fields to the Texas border was of great and incalculable benefit to those owning lands in the oil section of the then Indian Territory. Common knowledge of values and conditions then existing, and the admitted facts, show conclusively that the estate of the allottee was beneficially affected; that there was paid to her legal guardian a sum adequate for all losses sustained. We must therefore conclude that the act of Congress is not unconstitutional, but, on the other hand, was the exercise of a power over which Congress, by constitutional grant, had full authority to legislate.

It is urged that the enacting clause of the act shows on its face that the act was only for the benefit of pipe line companies, and not the owners of lands to be crossed or occupied by said companies. The preamble reads, "An act authorizing the Secretary of the Interior to grant right of way for pipe lines through Indian lands," and of itself does not determine the question of the resultant benefits. The legislation is in harmony with that already cited, and in keeping with the governmental policy in its past course of dealings with Indian citizens.

Nor is the objection that the allottee was at the time a citizen of the United States of avail. *Tiger v. Western Investment Company, supra.*

The judgment of the trial court should therefore be reversed, and judgment rendered in behalf of plaintiff in error.

By the Court: It is so ordered.