**BARNETT et al. v. BARNETT, County Judge, et al.**

No. 16784—Opinion Filed July 13, 1926.

Original Action for Prohibition.

Action by Jackson Barnett et al. against W. A. Barnett, County Judge of Okmulgee County, et al.

R. B. Drake, for Five Civilized Tribes.

PER CURIAM. Application for writ of prohibition denied.

BRANSON, V. C. J., dissents to the order made hereon on the 13th day of July, 1926, as follows:

The dissent herein is to the failure of the court to write an opinion in this cause, either granting or denying the application for writ of prohibition on the record as presented, briefed, and argued in this court, for that by reason of section 5, article 7, of the Constitution the decisions are required to be submitted in writing; and further dissents for that, irrespective of and without discussing the statutory proceedings not pursued in the appointment of the guardian in the instant case, from the record before this court the attempt of the county court to exercise jurisdiction over the restricted properties of the said Jackson Barnett is violative of the acts of the National Congress governing the same.

In Hickory et al. v. Campbell, 75 Okla. 79, 182 Pac. 233, this court said:

"Jurisdiction of the state courts over the person and property of minor allottees must come from a grant of Congress."

The opinion therein further pointed out that the same came by reason of section 6 of the said Act of May 27, 1908. There is no such grant by Congress as to adult Indian allottees of the restricted class, even though they be adjudged mentally incompetent, except in certain particulars not here involved. If Congress desires the state courts to have such jurisdiction, it could say so by definite language. But, on the contrary, we find that in June, 1906, the Congress of the United States passed a bill entitled "An act to enable the people of Oklahoma and of the Indian Territory to form a Constitution and state government, and be admitted into the Union, * * *" commonly known as the "Enabling Act." The enabling clause provided that the inhabitants of Oklahoma and Indian Territory might adopt a Constitution and become the state of Oklahoma. In the first section thereof, following the enacting clause, Congress said:

"Provided that nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said territories or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this act had never been passed."

The last section of said act (sec. 22) provided:

"That the constitutional convention provided for herein shall by ordinance irrevocable accept the terms and conditions of this act."

After the convention had drawn the Constitution of Oklahoma and in the schedule thereto, it complied with the said provisions of section 22 by accepting the terms of the Enabling Act in these words (sec. 45 of the schedule):

"Be it ordained by the constitutional convention, for the proposed state of Oklahoma, that said constitutional convention do by this ordinance irrevocable, accept the terms and conditions of an act of the Congress of the United States entitled 'An act to enable the people of Oklahoma and the Indian Territory to form a Constitution and state government,' * * * approved June 16, A. D. 1906."

By these provisions, it must be clear that Congress reserved the exclusive right to make laws and authorize regulations touching the property of the citizens of the Creek Nation, which was a part of the Indian Territory. The state of Oklahoma, to our knowledge, has never undertaken to violate the compact created by the provisions of the Enabling Act and the ordinance of the constitutional convention, and this court will never knowingly allow it to be done.

In the instant case, if Jackson Barnett is subject to a guardianship, it is solely by reason of the law of the state. He was at the time of the pretended appointment a full-blood Indian of approximately 63 years of age, was domiciled in Okmulgee county, and a citizen of Oklahoma. There is no federal statute subjecting the control of the restricted properties such as here or the management thereof of full-blood adult citizens of the Creek Nation to the probate courts of Oklahoma. The record herein concedes

that all of the property of Jackson Barnett is restricted; that is to say, his allotment as a citizen of said tribe was restricted against alienation; the execution of the oil and gas lease thereon was subject to the approval of the Secretary of the Interior, the moneys arising therefrom came into the hands of the Department of the Interior, under the acts of the national Congress, and could be managed, controlled, and directed under such rules and regulations authorized by such acts. The alleged incompetency, it appears, of Jackson Barnett is not due to mental deficiency, however, but to racial weakness, lack of education and business training. This condition of the Indian had received recognition in the laws of the United States for more than a hundred years, and Congress had therefore constituted the government, through the Secretary of the Interior, as paramount guardian, charged with the responsibility of looking after such Indians as a helpless and dependent people. Long before the law of this state, authorizing the appointment of guardians of citizens of this state under certain conditions, sprang of existence, this paramount guardianship of the national government, through the Department of the Interior, was rooted and grounded in its idea of public and humanitarian justice. Through the long years into the government's existence, the national Congress had looked after such Indian citizens, their properties and their welfare, as a guardian of his ward. If at all, when did the Oklahoma statute intercept the exercise of such authority? And when did an officer of the Oklahoma law, who derives his authority solely therefrom, have the temerity to undertake to undo what the Interior Department had done, with funds under its control, by virtue of congressional enactments? Such authority was expressly reserved by the Congress, and its reservation was expressly accepted by Oklahoma. and the law of this state, both where it is operative in itself and where it may find expression in the power of others to act, can never interfere with, or supervise, much less strike down, the authority of the officer of the government to have absolute control of such properties as directed by the law of the nation. Congress authorized this to be done under such rules and regulations as the Secretary of the Interior saw fit to prescribe. Parker v. Richards, 250 U. S. 235. It is so well recognized that it needs no citation of authority to support the same that rules and regulations made in pursuance of statute have the force and effect of law. Indians cannot be thwarted in the exercise of their rights, given by acts of Congress under and through the guise of a statutory state guardianship. To do so is equivalent to say to the officers of the government charged with the duty of administration of the properties of restricted Indians: "You cannot deal directly with your wards, for by the mandate of a county court of Oklahoma, acting under the law of the state, another person is designated with whom you must deal. Unless you so deal, all your acts, though they may be requested by your Indian ward whose interest you are required to guard, will be defeated, undone, and stricken down by the guardian; these officers so appointed by the courts will supervise all allowances you make; sue those to whom they are to pay."

Such use of his authority through such officer of the county court can be held to be none other than an infraction of the compact made with the federal government by the said irrevocable ordinance. This court should not lend its sanction by its failure to direct its writs against such officers of inferior courts, when the results of its acts will work an interference with the power of the duly constituted officers of the national government. No court of this state, and no officer of such court, has any concern with the restricted property of Jackson Barnett in the hands of the Secretary of the Interior, nor has such court or officer any right to pursue a course the object of which is to defeat the disposition of such property which the Secretary of the Interior has seen fit to make at the request of the ward of the government.

The order of the court directing the guardian to pursue such course and maintain suits, wherever brought, is itself a violation of the Constitution of the state, in that the object and purpose is to interfere with the complete and free exercise of the federal jurisdiction over such Indians and their restricted properties. In an attempt to justify it, this purported guardian, through his counsel, insists that he is engaged in acts of benefaction for his ward, to wit, the said full-blood restricted Indian. His acts and conduct are done against the ward's will. Counsel argue that, although this Indian is past 75 years of age, has no children, nor other relatives, as the record discloses, he says, has no friends who recognized him before he obtained wealth through a discovery of oil on his restricted allotment, these gifts, which the officials at Washington approved, to the American Baptist Home Mission Society and the gift to his wife were "loots." These assertions would be passed

as being occasioned solely by the heat of discussion, did the record not disclose the true setting as to this so-called "loot." Can it be said that a gift by a man to his wife is a loot? Can it be said that a gift for the benefit of an educational institution, whose efforts are confined to Indians, among whom the donor has spent his life, and of whom he is one, can properly be referred to as a loot, when the Indian who makes the gift recites in the written document the purposes thereof, and the reason therefor? Can it be said that he loots his own estate by the donation to his wife of what apparently is much less than the succession laws of Oklahoma give a wife on the death of her husband?

Throughout the decisions of the Supreme Court of the United States in reference to the rights of such full-blood Indian citizens, they have been considered as a helpless and dependent people. It was this condition that caused the government at the inception of its policy, to declare that they were wards of the government and subject to its protection and care. That court held in Cherokee Nation v. Georgia, 5 Pet. 1, and has held repeatedly since that decision, that :

"Indians are wards of the nation and as such are entitled to the care and protection due from a guardian to a ward. It is clearly the duty of the Interior Department to see that the rights of the Indians are protected and their welfare promoted even in the absence of specific provisions of law."

Again, in Heckman v. United States, 56 L. Ed. 820, the court says, after the citation of much authority and in the body of the opinion on page 832:

"There can be no more complete representation than that on the part of the United States in acting on behalf of these dependents, whom Congress, with respect to the restricted lands, has not yet released from tutelage. Its efficacy does not depend upon the Indians' acquiescence. It does not rest upon convention, nor is it circumscribed by rules which govern private relations. It is a representation which traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care, and it recognizes no limitations that are inconsistent with the discharge of the national duty."

In the case of U. S. v. Waller, 61 L. Ed. 843, the court stid:

"Before dealing with its interpretation, it is necessary to have in mind certain matters which are well settled by the previous decisions of this court. The tribal Indians are wards of the government, and as such under its guardianship. It rests with Con

gress to determine the time and extent of emancipation. Conferring citizenship is not inconsistent with the continuation of such guardianship, for it has been held that even after the Indians have been made citizens, the relation of guardian and ward for some purpose may continue. On the other hand, Congress may relieve the Indians from such guardianship and control, in whole or in part, and may, if it sees fit, clothe them with full rights and responsibilities concerning their property, or give to them a partial emancipation if it thinks that course better for their protection. United States v. Nice, 241 U. S. 591, 598, 60 L. Ed. 1192, 1195, 36 Sup. Ct. Rep. 696, and cases cited."

The Supreme Court of Oklahoma, in the case of Texas Company v. Henry, 34 Okla. 343, 126 Pac. 224, approved these views.

In Rainbow v. Young, 161 Fed. 835, Mr. Justice VanDevanter quotes from United States v. McDaniel, 7 Pet. 1, 8 L. Ed. 587:

"A practical knowledge of the action of any one of the great departments of the government must convince every person that the head of a department in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by the law, but it does not follow that he must show a statutory provision for every thing he does. No government could be administered on such principles. To attempt to regulate by law, the minute movements of every part of the complicated machinery of government would evince a most unpardonable ignorance on the subject. Whilst the great outlines of its movements may be marked out and limitations imposed on the exercise of its powers, there are numberless things which must be done that can neither be anticipated nor defined, which are essential to the proper action of the government."

No doubt the courts of Oklahoma might appoint guardians of full-blood Indians, as they might of other citizens of the state, upon a proper showing being made, and a compliance with the statute, but when such jurisdiction is invoked, and is exercised, it cannot extend in the management of the properties of such Indian to the extent of substituting the guardian as the person with whom the Secretary of the Interior is compelled to deal, whether he elects to do so or not, in lieu of the Indian, the ward of the government; but the Secretary of the Interior as to all such restricted properties gets his right to deal with the Indian through a law superior to the source of the authority of such court and guardian. If the Secretary finds that any Indian is of such mental condition that it is to his advantage to deal with his guardian as to

any particplar transaction, he would no doubt have such discretion.

The right of such national officer cannot under this kind of procedure be wrenched by the state from him. If this were possible in one case, the county courts, if they saw fit, might appoint guardians for each and every restricted Indian, and under such a condition the Secretary of the Interior, in carrying out the purposes, policies, and laws of Congress, would thereby be compelled to refrain from dealing with his wards, but directed to deal with some other person, whose desires, whims, and caprices he would be compelled to respect. We should not lay down a principle in one case which might lead legally and logically to such an interference, the permission of which the pledge of this state is against.

It is not in dispute that any of the properties which the county court of Okmulgee county has ordered the guardian to bring suit to recover, arose from his restricted allotment as an Indian citizen of the Creek Nation, and that such moneys were at the time the donations were made and approved by the Secretary of the Interior. and delivered to the said American Baptist Home Mission Society and his said wife, restricted funds in the hands of the Secretary of the Interior. They arose under an oil and gas lease made by the sanction of the Secretary of the Interior. under the provisions of section 2 of the Act of Congress of May 27. 1908, 35 Stat. at L. 312. The regulation of 1922, supra, was such a regulation as he had power to make, and was such a regulation as the officers of this state must respect. If the mental competency of this ward to initiate the donation was questioned, it was within the quasi judicial power of the Secretary of the Interior to pass on the same, and ascertain whether he was of disposing mind; this is a power necessarily given him in performing the duties as to such Indians, imposed by Congress. He passed on that in approving the request of the Indian. By his act, the legal and equitable title to the bonds in question passed, subject only to the trust agreements, and no state agency has any authority to interfere with such executed transaction.

The writer is therefore driven to the conclusion that even if Carl J. O'Hornett (and Bailey as his successor) was regularly appointed by a full and complete compliance with the statute of this state, relative to the appointment of a guardian for one of its mentally incompetent citizens, that the power of the court in directing that guardianship can extend no further than a protec-

tion of his person, and such property, if any, as to which the control is not expressly reserved in the Secretary of the Interior, or conferred on such courts. The attempt, as disclosed by the record, of the county court to order suits to be brought to recover restricted property, the disposition of which was approved by the Secretary of the Interior, and the attempt of the guardian to carry out such order, would be such an abuse and excessive use of authority that the power of this court should be exercised to prevent the same, by a writ of prohibition.