## KAY COUNTY GAS CO. v. BRYANT et al.

No. 18721. Opinion Filed Dec. 31, 1928.

Rehearing Denied Feb. 12, 1929.

136

William H. Zwick, Chas. B. Stewart, and Leahy, MacDonald & Files, for plaintiff in error.

H. P. White, for defendants in error.

BENNETT, C. Kay County Gas Company brought suit in district court of Osage county to restrain defendants, Mary J. Bryant and her tenant, Pete Privett, from interfering with plaintiff in the use of certain improvements on a six-acre tract of land in south half of southwest quarter of section 17, township 22 north, range 10 east, Osage county, Okla. The parties occupy the same positions as they did in trial court, and they will be referred to as plaintiff and defendants as they there appeared.

Plaintiff alleges that in the spring of 1920, it made application to, and secured from, the Department of the Interior a permit to erect a pump station on said lands under Act of Congress of March 11, 1904. Said permit fixed the rental payable for the benefit of the landowner, Cecil Bryant, a one-eighth blood Osage Indian minor, at $50 per year; That under said permit plaintiff built said pump station and paid all rentals thereon to date of trial; that Cecil Bryant, after maturity, sold to his mother, Mary J. Bryant, who was not of Indian blood, all his said lands, and sometime thereafter she took possession of said pump station and appropriated same to her own use, and plaintiff seeks to enjoin her and her tenant from interference with such property. A temporary restraining order issued, and plaintiff, under such order, removed the materials of the pump house, which had been dismantled Defendants filed a general denial, and alleged the improvements were of considerable value, and belonged to the realty, and a cross-petition for permanent damage to the land, and for the value of the said removed material, and praying injunction against plaintiff.

Defendants admitted possession of the property and receipt of all rentals to date, and that the pump station was built by their permission. Plaintiff admitted that it had ceased, temporarily, at least, to use the pump station as such, but denied abandonment, and further admitted the removal of material of the razed pump house. Upon these admissions, the court held the improvements were not trade fixtures, but became part of the realty, and that, while plaintiff had the right to use same so long as it paid rent, it might not remove same, and that defendant was entitled to recover on cross-petition the value of material of the dismantled pump house removed by plaintiff, which the jury found to be $400. Plaintiff was enjoined from removing said improvements. From this judgment plaintiff appealed.

One determinative question is presented, to wit: Were the improvements a part of the realty, or were the same trade fixtures —personal property—and subject to be removed by the plaintiff?

Plaintiff contends: First, that it entered into possession of the land under permit granted under Congressional Act of March 11, 1904, which authorized the Secretary of the Interior to grant an easement for the construction, operation and maintenance of pipe lines across the land of restricted Indians. On the other hand, defendants contend that said act does not apply, because, first, plaintiff did not secure permission from the Secretary of the Interior until after the buildings were constructed; second, because the Act of Congress of June 28, 1906, repealed the Act of March 11, 1904, in so far as Osage Indians were concerned; and third, that the Secretary of the Interior, under the Act of March 11, 1904, never had authority to grant permission to construct a pump station.

Defendants concede that plaintiff entered legally into possession of the property, but contend that plaintiff is a tenant from year to year of defendants because they have accepted the yearly rental. Plaintiff contends, in answer, that the Secretary of the Interior had the right to grant permission to construct pump stations and buildings to protect the machinery, and also buildings in which to house their employees on the theory that the grant of express power carries with it by necessary implication every other power necessary and proper to the execution of the power expressly granted. (Citing Lone Wolf v. Hitchcock, 187 U. S. 556; Texas Co. v. Henry, 34 Okla. 342, 126 Pac. 224.) It is also pointed out by plaintiff that the Secretary of the Interior has made certain rules and regulations under section 3 of the Act of June 28, 1906, and sections 1 and 2 of the Act of March 3, 1921, which acts provide for the leasing of oil and gas lands belonging to restricted Indians, and that, where such improvements are placed upon the land, the same shall be paid for by the landowner,

and that this shows the intention of the Department of the Interior concerning the removal of improvements under the act in question.

We do not deem it necessary to discuss the several contentions made. It is admitted, or conclusively established: First, that the owner of the land was an infant Osage Indian about 20 years of age when the application for the easement upon his property was filed, and that he, and later, his mother, the defendant, assented to the taking possession by plaintiff; second, that the real property on which the easement was sought was about 6½ acres carved out of a farm of about 400 acres owned by allottee; third, that the Department of the Interior, on April 14, 1920, granted a temporary permission to plaintiff to proceed with construction of the pump station, at which time plaintiff paid into the Department $100 to be applied to rental for the benefit of the allottee, and the final approval of said permit was made by said Department February 25, 1921, which dated back to and from April 14, 1920; fourth, that the improvements were installed under this permit, and the annual rental has been paid from date of temporary permit to day of trial; fifth, that Mary J. Bryant, who is not an Indian, took a deed for the 400 acres of land from Cecil Bryant, her son, in 1924; sixth, that the pump station is situate about ten miles from the nearest town, Hominy, and that all improvements placed on the pump station plat were necessary. These improvements consisted of a power house to house the machinery, warehouse, pump house and three cottages, which were occupied by the three pump men who operated the station. It was operated in three eight-hour towers. The roads were so bad the employees had to be housed on the premises. The houses were put on concrete foundations to level them up. Seventh. There was no construction except that actually necessary to operate the pump station, and the improvements followed the usual method of construction as to material and amount ordinarily used to operate a pump station. Eighth. It appears to be conceded that plaintiff had a right to install the pump station in the first instance. Ninth. The defendants admit that the plaintiff is owner of all the pipe line, machinery, engines, boilers, tools, oil tanks, etc., but deny plaintiff's right to remove any buildings, the water pump, water pump house, water tank and equipment. Defendants further say that plaintiff abandoned the premises. Defendants say, first, that the general Act of Con-

gress approved March 11, 1904 (33 Stat. L. 65) provides that:

"No such lines shall be constructed across Indian lands, as above mentioned, until authority therefor has first been obtained from, and the maps of definite location of said lines approved by, the Secretary of the Interior."

They contend that if the act be applicable at all, the improvements were installed before the permit was issued. We think the evidence clearly shows the improvements were constructed under a temporary permit given when the money damage was deposited therefor, although final certificate was not issued until after buildings were erected. Defendants' construction of the act, we think, is entirely too technical. They next say that the act of Congress relied upon the further provision:

"And nothing herein shall authorize the use of such right of way, except for pipe line, and then only so far as may be necessary for its construction, maintenance, and care. * * *"

—and also that the Act of Congress approved June 28, 1906 (34 Stat. L. 539) is a special act and applies only to what was formerly the Osage Indian reservation, and provides for the allotment of lands in severalty, and quotes section 7 thereof.

It is defendants' contention that, under the latter act, plaintiff should have dealt directly with Cecil Bryant's parents. We are not able to see how this reasoning could aid defendants, for, if for any reason there was any lack of authority in granting the permit (which we do not hold), it should not now avail defendants. The permit was made by the Secretary of the Interior for the 20-year old Indian boy, and the payments provided for in the same were collected for his benefit and paid to him for three or four years without protest or objection, and then he sold his land, including that on which the pump station rested, to his mother, Mary J. Bryant, who likewise collected the money on this contract and under this permit—the purchase price of this easement—for an additional two years. Mary J. Bryant was not an Indian and was of full age. If, in fact, there was any contract between Kay County Gas Company and Cecil Bryant, it was the one made for his benefit by the government, acting as his guardian, and if there existed any contract under which Mary J. Bryant was entitled to the yearly rental, it was the contract which now Mary says is invalid, after she has taken the proceeds of the contract for two years or more. Cecil Bry-

ant is making no protest, setting up no disability; the mother has no disability. She is accepting now the fruits of a contract which she seeks to invalidate. This should not be permitted.

Again, are these improvement fixtures a part of the realty to such extent as not to be removable? Section 8555, C. O. S. 1921, is as follows:

"When a person affixes his property to the land of another without an agreement permitting him to remove it, the thing affixed belongs to the owner of the land, unless he chooses to require or permit the former to remove it: Provided, that a tenant may remove from the demised premises at any time during the continuance of his term any thing affixed thereto for the purpose of trade, manufacture, ornament or domestic use, if the removal can be effected without injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises."

In 11 R. C. L. p. 1083, the text says:

"Generally, a building erected on the land of another by his consent or license does not become part of the realty, but remains the property of the person annexing it (citing Prince v. Case, 10 Conn. 375, 27 Am. Dec. 675, and note; Hamlin v. Parsons, 12 Minn. 108, 90 Am. Dec. 284), and may be removed by him (citing Osgood v. Howard, 6 Greenl. [Me.] 452, 20 Am. Dec. 322; Salley v. Robinson, 96 Me. 474, 52 Atl. 930, 90 A. S. R. 410). * * * Such a building does not pass to a purchaser of the land (citing Peaks v. Hutchinson, 96 Me. 530, 53 Atl. 38, 59 L. R. A. 279). * * * This rule certainly holds when there is an express reservation of a right to remove the building (citing cases), and generally it is considered that where the landowner consents to the placing of a building on his land by another without an express agreement as to whether it shall become a part of the realty, or remain personalty, an agreement will be implied that it is to continue personal property." (Citing Merchants' Nat. Bank of Crookston v. Stanton, 55 Minn. 211, 56 N. W. 821, 43 A. S. R. 491.)

In the case of King, Trustee, etc., v. Morris (N. J.) 68 Atl. 162, 14 L. R. A. (N. S.) 439, the second paragraph of the syllabus reads:

"Fixture—License—Ownership. When a person placed a frame factory upon the land of another, with the landowner's license, with no agreement respecting the subsequent ownership of the factory, the presumption is that the building remains the property of the party annexing it, and is removable by him."

In this case one Paschall erected a factory building upon concrete foundations upon the lands of Mrs. Morris, his mother-in-law, under permission and he had never paid rent for it. He said the understanding was that when the building was finished, it was to be turned over to Mrs. Morris; that she was to have the machinery and fixtures. Mrs. Morris testified that Paschall merely asked her permission to erect a factory building upon her ground and she told him yes, that was the best thing he could do; that he did not agree to pay her any rent, and she thought she was the owner of the factory because she was owner of the land. Paschall became bankrupt. The jury found a verdict for the trustee in bankruptcy, the plaintiff, who was suing Mrs. Morris for having removed the building. In the opinion the court says:

"The maxim respecting the ownership of structures placed upon land is quicquid plantatur solo, solo cedit. Broom, Legal Maxims, 354. But the maxim that whatever is placed upon the land belongs to the land is subject to numerous exceptions. One of the most conspicuous modifications of this rule is exhibited in the instance of fixtures put upon property by a tenant. Had Paschall been a tenant of Mrs. Morris, and as such had placed the structure in question upon her ground, it, from its character and use, would have been removable before or at the end of his term. Paschall was not a tenant; but it conclusively appears that he entered, erected, and maintained this factory by the permission of Mrs. Morris. The query is presented whether, as a licensee of Mrs. Morris, the presumption would arise, without proof of any agreement, that a right to remove the factory existed, and so the factory retained its character of personalty. The doctrine that a structure, however costly, if placed upon the land of another by permission, which permission may be recalled at any time, becomes, in the absence of specific agreement, irrevocably attached to the land upon which it is placed, is manifestly opposed to the intention implied in the very transaction. The inference springing out of such a license is that the land used is to be left as found, and the property so placed thereon shall remain the property of the user, and be removable as such. This was the view entertained by Mr. Justice Dixon in the case of Pope v. Skinkle, 45 N. J. L. 39. The rule is supported by an abundance of authority elsewhere. Howard v. Fessenden, 14 Allen, 124; Wells v. Banister, 4 Mass. 514; Dubois v. Kelly, 10 Barb. 496; Curtis v. Hoyt, 19 Conn. 154, 48 Am. Dec. 149; Fischer v. Johnson, 106 Iowa, 181, 76 N. W. 658; Brown v. Baldwin, 121 Mo. 126, 25 S. W. 863; Peaks v. Hutchinson, 96 Me. 530, 59 L. R. A. 279, 53 Atl. 38; Northwestern Mut. L. Ins. Co. v. George, 77 Minn. 319, 79 N. W. 1028, 1064. * * * In view of the facts as they existed, the trial judge

properly covered the point in question by charging the second request of the plaintiff. He charged that, where there was no other circumstances, and merely an erection, with the permission of the landowner, of a factory building of the character of the one involved in this suit, the more reasonable inference is that the builder had designed not to part with his property, and the landowner had consented to that understanding. This charge was certainly sufficiently favorable to the defendant."

In Fischer v. Johnson, 106 Iowa, 181, 76 N. W. 658, supra, the court says:

"Where erections are made on land by one having no estate in the land, but by permission of the owner, an agreement that the structures shall remain the property of the person making them will be implied in the absence of any other facts and circumstances tending to show a different intention."

In Merchants' Nat. Bank of Crookston v. Stanton, 55 Minn. 211, supra, the second paragraph of the syllabus is as follows:

"If buildings are constructed on land by one having no estate therein, and hence no interest in enhancing its value, by permission or license of the owner, an agreement that the structures shall remain the property of the person erecting them will be implied in the absence of any facts or circumstances tending to show a different intention."

In this last case, it was held that a prior mortgagee could not claim the structure, since it was not a part of the property when he extended the credit. The building in this case was a large two-story frame structure, with a one-story brick addition designed for an oatmeal mill. In this case a differentiation is made between states where a mortgage is only a security, and in those states where the title of property is vested in the mortgagee under the common law.

In Security Loan & Trust Co. v. Willamette Steam Mill, Lumber & Mfg. Co., 99 Cal. 636, 34 Pac. 321, it was held that a building of 1½ stories, with good cornices, shingle roof, grate, fireplace and chimney, well put up and sealed inside, erected as a lumber office and a place in which to sleep, was a trade fixture within the meaning of a statute similar to section 8555, C. O. S. 1921.

"The presumption is in favor of the right of a tenant to remove buildings which he has placed on the leased property for his own purposes." George E. Searle v. Roman Catholic Bishop of Springfield, 203 Mass 493, 25 L. R. A. (N. S.) 992.

In paragraph 26, entitled "Effect of Consent or License to Erect Building," 11 R. C. L. p. 1083, after reciting that generally a building erected on the land of another by his consent or license does not become a part of the realty, it is said:

"In such a case it is immaterial what is the purpose, size, material, or mode of construction of the building, and the nature of the property is not changed by the fact that the owner of the building may have such an interest in the land as would enable him to maintain an action of trespass for an injury to the possession." Citing Dame v. Dame, 38 N. H. 429, 75 Am. Dec. 195, and Laird v. Connecticut, etc., R. R., 62 N. H. 254, 13 A. S. R. 564.

In 11 R. C. L. p. 1059, three general tests are announced which may be applied in determining what are fixtures: (1) Annexation to the realty, either actual or constructive; (2) adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) intention to make the article a permanent accession to the freehold. These tests, the author indicates, do not establish definite criteria, but leave each case to be determined from the circumstances and nature of the annexation, the uses to which the property is put, and also the relation of the parties, and these general tests are subject to the qualification that the rights of the parties are liable to be controlled by special agreement. In the succeeding section it is indicated that the first test—that of annexation—is generally held to be uncertain and unsatisfactory, and the tendency is to accord it less and less significance. Citing Ottumwa Woolen Mill Co. v. Hawley, 44 Iowa, 57, and other cases. Under note 19, it is further indicated that physical annexation alone is not sufficient. Citing Atchison, etc., R. Co. v. Morgan, 42 Kan. 23, 21 Pac. 809. The author says:

"The extent and mode of actual annexation have now little weight except in so far as it relates to the nature of the article itself, the use to which the article is applied, and other attending circumstances as indicating the intention of the party making the annexation." (Citing Feder v. Van Winkle, 53 N. J. Eq. 370, 33 Atl. 399.)

On page 1062 of 11 R. C. L. the author says:

"The third test stated, the intention of the party making the annexation, has been said by some of the authorities to be a controlling consideration, and generally it is held to be the chief test. It is not always determinative, but in cases of doubt it has a controlling influence. (Citing Kelly v. Austin, 46 Ill. 156, 92 Am. Dec. 243.) To have this effect, the intention to make an article a permanent accession to the realty must affirmatively and plainly appear, and

if the matter is left in doubt and uncertainty, the legal qualities of the article are not changed, and it must be deemed a chattel. (Citing Teaf v. Hewitt, 1 Ohio St. 511.) But the test of intention is to be given a broad and comprehensive signification. It does not merely imply the secret action of the mind of the owner of the property, nor need it be expressed in words, but is to be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made; **which, obviously, suggests that the other tests are really part of this comprehensive test of intention, and that they derive their chief value as conspicuous evidence of such intention."** Citing Hutchins v. Masterson, 46 Tex. 551, 26 Am. Rep. 286, and Ottumwa Woolen Mills Co. v. Hawley, 44 Iowa, 57, 24 Am. Rep. 719.

The record shows that upon considering the application for permit for this pump station, a report was made to Secretary of the Interior by the Superintendent with respect to this matter "that the assessment is satisfactory to the allottee, and recommends that the application be approved," and under this the permit was approved.

The improvements on the property consisted of a pump station building to house equipment, 40x40 steel frame iron building, boiler house about 20x20 of the same construction, a warehouse in one end of which was the office building, and a small oil house about 12x12 for storage of lubricating oil, and three small cottages, one for each of the pumpers. These houses were set on concrete foundations and the testimony is without dispute that this was the ordinary, standard kind and quality of construction necessary for running and maintaining a pump station, and that every part of it was used exclusively for that purpose, and it was so built as to be removable. The capacity of the pipe line was about 4,000 barrels per day. Defendants contend that the improvements were abandoned. The evidence of plaintiff is that the production in that field went down so that plaintiffs connected their lines coming in there and pumped past that station, and that it was shut down temporarily until plaintiff should see fit to reopen in case production should improve. There is no proof that the removal of improvements will damage the freehold. It is all the other way. What, then, under the admissions and undisputed evidence, are the facts? Plaintiff secured a permit from Interior Department upon their finding that it was agreeable to the allottee, and erected,

at an expense of thousands of dollars, a pump station on the 6½ acres in the usual and ordinary fashion, and used every part of it, and paid the rental charged thereon for perhaps six years. The allottee became of age, sold the 400 acres of land, including the 6½ acres to his mother, and she received the rental thereafter. This station was never abandoned by plaintiff, as found by the court, but the operation of it was temporarily discontinued until oil production should increase, meanwhile paying rent. Defendants, upon the claim of abandonment, seized the property, and with the rent in their pockets assert ownership of all the improvements. It is certain that the plaintiff, who was operating the pipe line, was not interested in this 400-acre farm; that it had no interest or purpose to enhance its value. They were operating simply a pump station in prosecution of their own particular enterprise. There would seem to be no more reason for defendants to claim the warehouse and the pump house as their own than the pipe line itself. They were but necessary parts of a single enterprise, conducted for a single purpose. It is true the permit for the use of the premises was for a long time and provided for renewal. That furnishes no logical reason why the buildings should have been attached in a more temporary fashion than they appear to have been, but, in fact, would seem to justify the mode of construction that was used.

Plaintiff offered to prove what was the intention of the parties at the time these improvements were constructed. Much of this proof was rejected by the court, although the intention of the parties in such case is the controlling matter. All the evidence, we think, the nature of the attachment of the property, the relation of the parties, the purpose for which the improvements were made, and the adaptability of the improvements for the peculiar purposes for which they were intended, show that these improvements remained the property and chattels of plaintiff, and also that no substantial hurt will come to defendants by reason of the removal thereof, which conclusion disposes of the controversy, and, for these reasons, and under the authorities above cited, and under the doctrine announced in our state in the case of Texas Co. v. Henry, 34 Okla. 342, 126 Pac. 224, we hold that the court was in error in declaring these improvements fixtures and a part of the soil. In the last-named case, Judge Sharp, in the syllabus, uses the following language:

"Occupying the position that the federal government does in its guardianship over the Creek Indians, and its obligation to protect them in their property and personal rights, it cannot be said that Act March 11, 1904, pursuant to which an allottee, through her legal guardian, received $892.50 cash for a 20-year easement on 11.9 acres of land, was not in the interest of or beneficial to such allottee, but, instead, was wholly in the interest of companies engaged in piping oil and gas through the Indian Territory, though such act was primarily for the benefit of such companies."

In the body of the opinion, it is said:

"In addition to the legal disability of infancy, her allotment was inalienable without the aid of congressional enactment, and her title thereto could have been divested in no other manner. But the sovereignty that created the limitation on the right of alienation also had the power to remove it at will, so long as no constitutional inhibition was violated. By the act in question, the Secretary of the Interior was given the power to grant a right of way in the nature of an easement over her lands; full authority being given said officer to fix the compensation to be paid to individual allottees. * * *"

In the case of Winans v. Beidler, 6 Okla. 603, 52 Pac. 405, Chief Justice Dale, speaking of a statute in identical terms with section 8555, C. O. S. 1921, says that this statute is but the re-enactment of the common law upon this subject. The court in that case cites Crocker v. Donovan, 1 Okla. 165, 30 Pac. 374. The same doctrine is announced in Bridges v. Thomas, 8 Okla. 620, 58 Pac. 955, and also in Lawton Pressed Brick & Tile Co. v. Ross-Kellar, etc., Co., 33 Okla. 59, 124 Pac. 43, in the syllabus of which we find:

"Chattels may be annexed to the real estate and still retain the character of personal property; * * * and if the intention is that they shall not by annexation become a part of the freehold, as a general rule, they will not."

There are many other cases to the same effect. Hinkle v. Bass Furniture Co., 117 Okla. 207, 246 Pac. 228; Elerick v. Reed, 113 Okla. 195, 240 Pac. 1045; Tolle v. Vandenberg, 44 Okla. 780, 146 Pac. 212. The defendants cite with assurance Hinkle v. Bass Furniture Co., supra. That case involved certain shelving which was without permission of owner attached to a store building. That was necessary for the purpose of improving the building itself, to better the premises as a sales and store room. The improvements were in keeping with and necessary to the general use of the building, the only purpose to which it was adapted. Clearly that case is differentiated from this case. There was no thought in this case of building houses or pipe lines or pump station to improve the 400-acre farm, or to make it a better farm.

In 26 C. J. p. 679, "Fixtures," art. 43, we find:

"An agreement that the article annexed shall retain the character of personalty and be removable as such is ordinarily implied from the fact that the article or structure was annexed or erected by the license or permission of the landowner. * * * Annexations by a railroad company under express permission, or by force of a grant to it of a right of way, have been regarded as retaining their personal character."

To the same effect is St. L., K. & S. W. R. Co. v. Nyce, 61 Kan. 394, 59 Pac. 1040, which held that railroad, roadbed, bridges, side-tracks, and station house erected on right of way were trade fixtures, and did not pass under foreclosure of a prior mortgage on land out of which right of way was taken. Pipe lines in this state are dealt with by our statute as common carriers. C. O. S. 1921, sec. 7944.

Defendants reargue their motion to dismiss the case upon two grounds, but since this motion has been heretofore considered and denied by this court, we are not required to again consider same.

For the reasons given, the cause is reversed and remanded, with directions to the trial court to grant plaintiff injunction against interference by defendants with the possession, control and use of the improvements aforesaid so long as the annual rental therefor is paid and to vacate the money judgment and injunction against the plaintiff in favor of defendants.

REID, HERR, LEACH, and DIFFENDAFFER, Commissioners, concur. FOSTER, Commissioner, dissents.

By the Court: It is so ordered.

Note.—See under (1,2) anno. 59 L. R. A. 279; 14 L. R. A. (N. S.) 439; 11 R. C. L. p. 1083; 4 R. C. L. Supp. p. 733; 6 R. C. L. Supp. p. 688. See "Fixtures," 26 C. J. §87, p. 702, n. 97, 99.