In the Matter of MIDWESTERN FOOD STORES, INC., Debtor.

H. MEYER DAIRY COMPANY, Plaintiff,

v.

MIDWESTERN FOOD STORES, INC., Defendant.

Bankruptcy No. 1–82–0013. Adv. No. 1–82–0141.

United States Bankruptcy Court, S. D. Ohio, W. D.

July 30, 1982.

Richard E. Wentz, Covington, Ky., for plaintiff.

Paul E. Lukey, Cincinnati, Ohio, for defendant.

## DECISION ON COMPLAINT FOR RELIEF FROM AUTOMATIC STAY

BURTON PERLMAN, Bankruptcy Judge.

This adversary proceeding commenced by H. Meyer Dairy Company ("plaintiff") arises out of a Chapter 11 case that was filed by the above named debtor ("defendant") on February 3, 1982. The plan of reorganization provides for liquidation of defendant's assets and distribution thereof to creditors of the estate. This proceeding was initiated by plaintiff's filing of Complaint for Relief from Automatic Stay in order that it might proceed with its remedies against assets of defendant in which plaintiff claims a security interest.[1] The matter came on for trial at the conclusion of which we reserved decision.

---

1. The parties have stipulated that the value of the assets in which plaintiff claims a security interest is approximately $45,000. The debt owing to plaintiff is composed of three elements: 1) the balance owing on a promissory note of $39,898.03, with interest; 2) $18,417.11 on an open account; and, 3) an unpaid rental obligation of approximately $2800.00.

In its complaint, plaintiff seeks relief from the automatic stay on two grounds. First plaintiff alleges that it is not adequately protected because the value of a portion of its security—defendant's inventory of dairy and food products—is rapidly decreasing. Second is plaintiff's allegation that there is no equity in the collateral, the amount of the secured debt being greater than the value of the collateral, and that the collateral is not necessary to an effective reorganization.

The relevant facts are as follows. Defendant was incorporated under the laws of the state of Ohio on April 18, 1980. On May 1, 1980 plaintiff and defendant executed a written agreement whereby defendant purchased the Feldmann Dairy from plaintiff consisting of certain assets including inventory, equipment and fixtures. Several other documents were executed at the May closing of the sale, including a promissory note from defendant to plaintiff in the principal amount of $72,788.61; a security agreement whereby defendant granted to plaintiff a security interest in all of defendant's furniture, fixtures, equipment and inventory, including after acquired inventory, to secure payment of all obligations, present or future, owing to plaintiff; and, several leases under which plaintiff assumed the interest of lessor and defendant became lessee. In addition, a letter signed by Mr. David E. Meyer as president of plaintiff, from plaintiff to Mr. Pete Vaughn, president of defendant, was signed by Vaughn in his official capacity at the closing. The letter sets forth an agreement between the parties whereby plaintiff was to sell dairy products to defendant at certain prices and under certain billing terms.

Pursuant to Kentucky law, see, KRS 271A.540, defendant, on May 5, 1980, filed an application for a "Certificate of Authority" to transact business in Kentucky. The application sets forth a Cincinnati address as the address of defendant's principal office in the state of incorporation (Ohio) and an address in Campbell County, Kentucky as the address of defendant's proposed registered office in Kentucky. A Certificate of Authority to transact business in Kentucky was issued by the Commonwealth of Kentucky to defendant on May 5, 1980 (A certified copy of the Certificate was furnished by plaintiff post-trial. Together with it, plaintiff filed a motion moving acceptance of the Certificate as additional evidence. At the close of the trial we stated that we would hold the record open for receipt of the certified copy, and it therefore is unnecessary for us to act on plaintiff's motion.)

During its tenure as a going concern, defendant was engaged in the retail sale of food, beverages and other consumer products such as health aids and magazines. Defendant operated three stores, all of which were located in Kentucky. Defendant's office was located in Cincinnati and the testimony at trial established that the books and records of defendant were kept at this office and correspondence to defendant was directed to that location. Meyer testified that he sent letters to defendant to the Cincinnati office and considered defendant's business to have been conducted from that office.

Plaintiff filed a financing statement evidencing its security interest in the office of the county recorder of Campbell County, Kentucky. This was the only location at which plaintiff filed a financing statement.

The evidence presented by plaintiff at the trial established that it was a secured creditor and no question was raised as to the validity of its security instruments *qua* instruments. Further, plaintiff proved the amount owed it by defendant was greater than the value of the collateral by which it claims it is secured. In addition, debtor proposes to liquidate, not carry on its business. Plaintiff therefore has carried its burden of proof to entitle it to the relief sought in its complaint, for its proof shows no equity for debtor in the collateral and the collateral is not necessary for reorganization. Defendant, however, contends that plaintiff's security interest was not properly perfected, that plaintiff is therefore not a secured creditor. Its basis for this assertion is its position that the filing only in Camp-

bell county of its security agreement was insufficient under the law of Kentucky. We disagree and find that plaintiff's filing was sufficient. In the ensuing discussion we deal first with the issue of perfection. Thereafter, we turn to two other contentions raised by defendant.

1. *Perfection*

■ Prior to examination of the relevant state law that leads us to our conclusion, a reference to relevant bankruptcy law is in order. Through operation of the so-called "strong-arm" powers of the trustee, *see,* 11 U.S.C. § 544(a)(1),[2] if a trustee establishes that a secured creditor failed to comply with the requirements of state law regarding perfection of his interest, then that creditor is rendered unsecured. Because § 1107(a) of the Code vests a Chapter 11 debtor in possession, such as defendant in the instant situation, with essentially all powers of the trustee, defendant may utilize the avoiding power of § 544(a)(1). The perfection requirements of applicable nonbankruptcy law are thus brought into play.

■ The relevant statute which sets forth the proper location at which to record a security interest in order to perfect it under Kentucky law is KRS 355.9–401(1)(c), which provides:

"(1) The proper place to file in order to perfect a security interest is as follows: * * *

(c) In all other cases, if the debtor is a resident of this state in the office of the county clerk in the county of the debtor's residence, if the debtor is not a resident of this state but has a principal place of business in this state, in the office of the county clerk in the county where the nonresident has a principal place of business, if the debtor is a nonresident of this state and has no principal place of business in this state then in the office of the secretary of state of the Commonwealth of Kentucky" * * *

Subparagraph (c) sets forth three alternative locations for filing. As stated above, plaintiff filed its financing statement only in Campbell County. Therefore, plaintiff can be held to be secured only if defendant is determined to be a "resident" of Kentucky and Campbell County is the "county of the debtor's residence".

■ In support of their respective positions, the parties rely on the same decision—*National Cash Register Co. v. K. W. C., Inc.,* 432 F.Supp. 82 (E.D.Ky., 1977). In that case, the Court held that under KRS 355.9–401(1)(c) the "residence" of a corporation incorporated in Kentucky is the location of its registered office rather than the location of its place of business. Defendant argues that because it is a foreign corporation, it is a "nonresident" of Kentucky for the purpose of filing under the statute and, because its principal place of business is outside Kentucky, filing should have been made in the office of the Kentucky Secretary of State. This application of *K.W.C.* to the present case is erroneous for the following reasons.

First, the policy underlying the unique[3] Kentucky filing statute was explained in *K.W.C.* in the following manner (at pp. 86–87):

"Under Kentucky law, domestic and certain foreign corporations are required to have both a registered office and a registered agent in this state. KRS 271A.060; KRS 271A.555. The registered office may, but need not be, the corporation's place of business. Id. However, the reg-

---

**2.** Section 544(a)(1) states:

"(a) The trustee shall have, as the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such creditor exists."

**3.** Kentucky's version of Uniform Commercial Code § 9–401(1)(c) is unlike any adopted by other states and differs as well from the three alternative versions set forth in the U.C.C.

istered agent's business office must be identical to the registered office. *Id.* Thus, the place to file under the statute, i.e., the corporate debtor's residence, is easily determined. Kentucky creditors will not be required, as they would be if NCR's views were adopted, to guess at their peril which, of several places of business located in different counties, is a corporate debtor's "principal place of business". Nor will they find it necessary, in such cases, to file at more than one place in order to avoid the consequences of a wrong guess. Moreover, if the original filing is correct, such creditors need not be concerned with subsequent changes in the corporate debtor's residence. KRS 355.9–401(3)"

While the factual situation in *K.W.C.* involved a Kentucky corporation this expression of policy considerations is compelling herein. The Court's express reference to foreign corporations underscores the notion that the statute furthers the policy of eliminating guesswork as to the proper filing location with respect to foreign as well as domestic corporations.

Second, the Court in *K.W.C.* discussed several Kentucky cases having to do with a corporation's residence for venue purposes. The Court drew the following quotation from one decision in this line of precedent:

> "It is still sound law that if a *foreign* corporation has a chief office or place of business in Kentucky, that should be *deemed* its residence."

*K.W.C., supra,* at p. 85, quoting *Tufts v. Chesapeake & Ohio Ry.*, 401 S.W.2d 58 (Ky., 1966) (Emphasis by the *K.W.C.* Court). Explaining the meaning of "chief office or place of business," the Court further quoted:

> "Section 732 of the Civil Code of Practice, prescribing rules for construing the provisions of the Code of Practice, in subsection 32 declares that the word 'reside' means, with reference to a corporation, its 'chief office or place of business'. Subsection 33 defines who are and the rank of chief officers and agents of a corporation in this connection. *The resi-*

> *dence of a corporation is regarded as the county in which its chief officer or agent resides when the action is commenced . . . . . No distinction is made between the residence of a domestic and a foreign corporation.*"

*K.W.C., supra,* at p. 86, quoting *Knight v. Pennsylvania R.R.*, 264 Ky. 412, 416, 94 S.W.2d 1013, 1015 (1936) (Emphasis by *K.W.C.* Court). The Court concluded from these decisions that the "residence" of a corporation is not the principal place of business but is instead the residence of its chief officer or agent, and that such location is in accord with the view that the filing statute requires recordation in the county of the corporation's registered office. Significantly, for our purposes, the *Tufts* decision involved a foreign corporation and the *Knight* case referred to, and made no distinction between domestic and foreign corporations.

### 2. *Relationship Between Agreements.*

The second issue raised by defendants is whether the letter agreement under which the parties agreed to an open account sale of dairy products by plaintiff to defendant created an obligation that was secured by the security agreement. We hold that the security agreement extends in coverage to secure the open account.

The security agreement contains language which, in effect, provides for what are commonly known as "future advances" and "after acquired collateral" clauses. It reads in part:

> "[Defendant] hereby . . . transfers . . . any and all inventory which may hereafter come into existence, for the purpose of securing unto [plaintiff] the payment of any and all indebtedness, liabilities, and obligations (all hereinafter called obligations) of [defendant] to [plaintiff], direct or contingent, joint or several, whether as drawer, maker, endorser, guarantor or surety or otherwise whatsoever, whether with any person or not, due or to become due, and whether now existing or hereafter arising or contracted. The obligation to be secured hereby includes, but is not limited to, the indebted-

ness arising through the loans by [plaintiff] to [defendant], and all costs and expenses of [plaintiff] incurred in the collection of the account, and the sale or other disposition of the security hereunder"

Kentucky law recognizes such mechanisms to secure property which may come into the hands of the debtor subsequent to execution of the security agreement. *See,* KRS 355.-9–204(1), (3).

█ In *Malone and Hyde, Inc., v. Maxwell,* 557 S.W.2d 908 (Ky.App., 1977) the court faced a dispute similar to the one at hand. In *Maxwell,* the court held that merchandise supplied by the creditor to the debtor under an open account was secured by a future advances clause in the security agreement executed by the parties approximately one year earlier. While the Kentucky court interpreted the security agreement under Tennessee law, it noted:

"after a comparison of the applicable law of Tennessee and Kentucky, we are persuaded that there would be no difference in the interpretation." *Id.* at p. 909

Further, the court cited KRS 355.9–204(3) in reference to the efficacy of future advances clauses. There being no other reported Kentucky decisions bearing on this question, we accept the *Maxwell* case as a definitive statement of Kentucky law on this issue. We are therefore persuaded that the agreement between the parties providing for defendant's supply of dairy inventory falls within the future advances and after acquired property provisions of the security agreement to secure the unpaid balance of the debt on the open account.

Defendant argues that because there was no express agreement between the parties that the letter agreement was to be secured by the security agreement, and because the documents pertain to different subject matter, they are separate and distinct agreements having no effect upon one another. In fact, however, the subject matter of the two agreements does not differ. The security agreement expressly includes inventory, existing or after acquired, within plaintiff's collateral and expressly refers to future ob-

ligations arising between the parties. Further, defendant's assertion that an express agreement was required to secure the future credit sales ignores the fact that the very nature of future advances and after acquired collateral clauses has for its objective making it unnecessary to execute a new security agreement every time an advance is made to a debtor. *See:* 69 Am. Jur.2d *Secured Transactions,* § 315, at p. 150.

█ Plaintiff also contends that the unpaid rent owed by defendant is a secured claim by virtue of the future advances clause. We are unwilling to accept such a proposition. Unlike the debt owing to plaintiff on the balance of the open account, the subject of which was inventory, the rent obligation constitutes entirely different subject matter than that dealt with by the security agreement. Future advances clauses are valid only if the obligation is covered by the security agreement. (Comment to KRS 355.9–204).

## 3. *Illegality of Agreements.*

The final argument of defendant is that by virtue of a Kentucky administrative regulation that prohibits the furnishing of equipment in connection with the sale of milk, the entire transaction between the parties was unlawful, thereby rendering the security agreement and the letter agreement void. This argument is not well taken.

The regulation brought into issue by defendant provides as follows:

"Section 1. No processor, distributor, bulk milk handler, or producer-handler, either directly or indirectly, or through a subsidiary or affiliate corporation, or by any officer, director, stockholder, employee, partner, agent, or representative thereof, shall sell, furnish, give, lend or rent any equipment to any purchaser or consignee in connection with the sale or consignment of milk, cottage cheese or frozen dairy products; nor shall any equipment repair or service be provided by anyone hereinabove stated.

Section 2. Any person mentioned in the above section found violating this regulation shall be subject to the penalty provided for in KRS 260.991." 302 KAR 25:025.

This regulation was promulgated by the Kentucky Milk-Marketing and Anti-Monopoly Commission ("Commission") pursuant to KRS 260.715(1)(a) which authorizes the Commission to regulate marketing practices relating to milk and certain other dairy products. The manifest purpose of the regulation is to promote fair competition in the sale of the enumerated dairy products.[4]

The specific Kentucky statute implemented by the regulation is KRS 260.705, which provides in part:

"No distributor, processor, bulk milk handler, store or producer-handler, either directly or indirectly, or through a subsidiary or affiliate corporation, or gyany officer, director stockholder, employee, partner, agent or representative thereof, shall for the purpose or with the effect of restraining, lessening or destroying competition or injuring one or more competitors or injuring one or more persons dealing in milk, cottage cheese, or frozen dairy products or to impair or prevent fair competition in the sale of milk, cottage cheese, or frozen dairy products in this state, threaten or engage in any marketing practice established to be unreasonable by the commission, including, but not limited to, the marketing practices or methods of doing business described in this section: * * *

(c) Give, or offer to give, or allow any secret rebate, unearned discount, free service or services financial aid, free equipment or any other thing of value to any purchaser or consignee in connection with the sale or consignment of milk, cottage cheese or frozen dairy products."

 Clearly, the purpose of the regulation, prevention by the state of a perceived evil, as expressed by the Commission and the legislature, should be accorded consider-

able weight on the issue of whether the contracts violated the regulation. *See:* 17 Am.Jur.2d *Contracts,* § 166 at pp. 523–24. In this regard, defendant has offered no evidence that would in any way tend to show that the transaction entered into by the parties was meant to, or in fact did, lessen competition. Significantly, the evidence establishes that the dairy sales continued until approximately November 15, 1981, while the sale of the equipment was accomplished only at the outset of defendant's business, in May of 1980. The agreements did not require defendant to purchase any additional equipment from plaintiff and did not obligate defendant to purchase its dairy products requirements from plaintiff for any particular length of time. Further, the letter agreement itself provides that the price at which the dairy products would be sold to defendant was the same as that for another customer of plaintiff, Convenient Food Stores, Inc. In sum, no evidence has been offered to establish that the sale of equipment to defendant directly or indirectly benefited defendant or disadvantaged any of plaintiff's competitors in the milk marketing business.

## Conclusion

Having found plaintiff to possess a valid secured claim for the balance owing by defendant on the promissory note and the open account, plaintiff is entitled to relief from the automatic stay. In light of the value which the parties have assigned to plaintiff's collateral, and the amount of the debt owing to plaintiff, defendant has no equity in the property. Further, because this case is in the posture of a Chapter 11 liquidation, the property is not necessary to an effective reorganization.

The foregoing constitutes our findings of fact and conclusions of law.

---

**4.** The Commission's comment to the regulation states: "NECESSITY AND FUNCTION: This regulation serves to promote fair competition

in the sales of milk, cottage cheese and frozen dairy products ..."