In re K & A SERVICING, INC. and Baron Pipeline, Inc., Debtor.

Don NAVARRO, Trustee for Baron Pipeline, Inc., and K & A Servicing, Inc., Plaintiff,

v.

Raymond LUCAS, Individually and d/b/a Raymond Lucas Company and Lucas Construction and Lucas Gas, Inc., Defendants.

Bankruptcy No. 381–01029 M–11.
Adv. No. 383–0343.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

March 22, 1985.

Timothy J. Vineyard, Dallas, Tex., for plaintiff.

Richard E. Koenig, Alan Carlson, Bartlesville, Okl., for defendants.

## MEMORANDUM OPINION

ROBERT C. McGUIRE, Bankruptcy Judge.

This was an action by Don Navarro ("Trustee"), Trustee in bankruptcy for K & A Servicing, Inc. and Baron Pipeline, Inc. ("Debtors"), objecting to the claim and complaint to avoid transfers of property against Raymond Lucas, individually; and d/b/a Raymond Lucas Company and Lucas Construction and Lucas Gas, Inc. ("Lucas" or "Defendants").

Defendants asserted a claim against Debtors. The claim in question arose from the purchase of a gas gathering system by Debtors from Lucas, in or about November, 1980. The system is located in Washington County, Oklahoma. As security for the claim, Debtors granted Lucas a securi-

ty interest in only (a) 31,020 feet of 4″ line; (b) 6,600 feet of 2″ line; (c) one orifice meter; and (d) one dehydrator ("the collateral").

Lucas was not granted a security interest in all of the property sold to Debtors. Lucas did not retain a deed of trust, security interest, or mortgage line on the easements, rights-of-way, or gas contracts.

Lucas filed a financing statement in the county clerk's office of Washington County, Oklahoma. The financing statement consisted of a UCC–1 form, a description of the collateral identical to that contained in the security agreement, and a map purportedly describing the location of the pipeline. The map does not show the location of the dehydrator or meter.

The financing statement was filed in the UCC filings in the county clerk's office of Washington County, Oklahoma, but was not indexed in the tract indexes for the real estate records. No financing statement was ever filed in the county clerk's office of Oklahoma County, Oklahoma (central filing).

Findings of Fact and Conclusions of Law on file herein are incorporated herein by reference. This opinion contains additional findings of fact and conclusions of law.

The issues discussed in this opinion are:

1. Did the collateral remain personalty under Oklahoma law, thereby requiring central filing for Lucas to perfect his security interest?

2. Under 11 U.S.C. § 544, can the Trustee avoid the lien claims of Lucas in the collateral sale proceeds?

After Debtors purchased the gas gathering system from Lucas, Debtors constructed an additional 20,000 feet of line. Lucas never obtained or filed any additional security agreements or financing statements.

On August 4, 1981, Debtors filed their petitions under Chapter 11. In November, 1982, Don Navarro was appointed Trustee for the Debtors. Trustee obtained court authority to sell the gas gathering system (including the additional 20,000 feet of line added by Debtors, together with additional

rights of way, etc.) free and clear of all liens, claims and encumbrances, with the claim of Lucas, if any, to attach to the proceeds.

Pursuant to court order, Trustee sold to R H Operating Co. ("RH") the Lucas collateral specifically described in Lucas' security agreement and financing statement, to wit, 31,020 feet of 4″ line, 6,600 feet of 2″ line, one orifice meter, and one dehydrator. In the same transaction, Trustee sold the additional 20,460 feet of line, 26 rights of way, 11 road crossings, a railroad crossing permit, a gas purchase contract with Cities Service Company ("Cities Service") and a compressor site lease. As security to the RH sale, Trustee reserved a first lien security interest in all assets and equipment and a deed of trust lien on all real property interests and fixtures sold. From the sale to RH, Trustee received $50,000 in cash, plus a $200,000 receivable to be paid as a percentage of production.

Prior to constructing the pipeline he sold to Debtors, Lucas first obtained right-of-way easements from numerous parties. Trustee's Exhibits 7, 8 and 9, which were perpetual easements, were typical of the easements granted. The initial plans for the pipeline were designed by Grenwalt Engineering and Lucas. Lucas testified that, at the time the line was installed, he did not anticipate removing it, but that it could certainly be removed. Lucas considered the pipeline his own.

The total cost to Lucas for materials and labor in installing the pipeline was $115,750. Debtors' minimum cost to install the 20,460 additional feet of pipe was approximately $1.50 to $1.75 per foot, or a minimum installation cost of approximately $30,690. At the time of sale to RH, such 20,460 feet of pipe had a value of $8,184, or 40¢ per foot.

The dehydrator was purchased new in 1980 at a cost of $9,000 to $10,000. The orifice meter was bought new at a cost of approximately $800 to $900. At the time of sale by Debtors to RH, the meter was worth $450 and the dehydrator was worth $4,500.

Pipelines normally last approximately thirty years and dehydrators normally last 10–15 years if taken care of. There was no showing that the dehydrator was not taken care of.

Taking into account the age of the pipe, its location at sale, its cost, and the circumstances existing at sale, the Court finds that the 31,020 feet of 4″ pipeline had a value of $18,612, or 60¢ per foot, and the 6,600 feet of 2″ pipe had a value of $1,320, or 20¢ per foot, at the time of the sale by Trustee to RH. To install the Lucas pipeline, it was necessary to dig a one and one-half foot wide trench to bury the pipeline. It was PVC plastic pipe in 40-foot sections.

A dehydrator was attached to the underground pipeline for purposes of compressing the gas. The underground pipeline system was connected to the compressing system by a short span of pipeline rising above the ground. The compressing system included a dehydrator consisting of an assembly of three towers and a tank mounted on a platform. The dehydrator was fastened to the ground by two cement foundations approximately three feet deep in the ground to which the framework was bolted. Located along the main underground 4″ line were several gate valves protruding from the ground wherein the main lines could be shut off.

Lucas initially installed the pipeline for the purpose of compressing and transporting gas. Lucas did this for ten months prior to sale to Debtors. The pipeline installed by Lucas ran for approximately six to seven miles through Washington County, Oklahoma. The Trustee sold approximately eleven miles of pipeline imbedded in the ground in the easements and rights-of-way. It is a reasonable inference from the evidence introduced that, at the time of initial installation by Lucas, it was anticipated that the pipeline, meter and dehydrator would be used so long as gas could be economically transported through the pipeline. Lucas' intent, at the installation of the pipeline, was to use the pipeline only as long as it was needed.

At the time of the initial installation, Lucas also contemplated the possibility of connecting the pipeline to other pipelines. All the collateral was installed across land used for ranching, farming, or pastureland. Once the collateral was installed, the respective land owners could, and did, continue to use the land for ranching, farming, or pastureland without any interference. The collateral could be removed without any damage to it, or the land, and be reinstalled at a different location. Lucas installed the collateral for business purposes—to compress, transport, and sell the gas. Several of the easements obtained by Lucas specifically granted him the right to remove the collateral.

Wells were never located on the actual easements under which the pipeline was installed. At the time of the original installation of pipeline, there were gas wells on part of the properties over which the easements traversed, although those properties were primarily used for agriculture. At the time of the sale by Lucas to Debtors, some of the gas from some of those wells was transported through the pipeline in question. Insofar as it concerned Lucas, at initial installation of the collateral, the final destination for the gas transportation was to the lines of Cities Service, pursuant to a November, 1979 agreement with Cities Service.

Lucas' sales price to Debtors was $208,-000. Included in the Debtors' contract were three gas transportation and purchase contracts previously entered into between Lucas and Eastman, Ramsey and Ochelata Development Corporation. Lucas agreed to transport gas from Ramsey, Eastman, and Ochelata Development Company's wells through the gas pipeline. Lucas also sold Debtors the gas purchase contract between Lucas and Cities Service, along with easements granted to Lucas by Foster Petroleum, John and Hazel Allen, Zelma Foster, and George Pfeiffer.

Debtors agreed to compress and transport gas from two wells owned by Lucas, with the agreement setting forth terms if Lucas desired to hook up any new wells to the gas pipeline.

On January 5, 1981, Lucas, by and through his attorney, filed a financing statement in the Washington County Clerk's Office. This financing statement included Exhibits "A" and "B" thereto. At the time of filing the original financing statement, the filing attorney requested of the Washington County Clerk that the financing statement be filed in the Uniform Commercial Code filings and also be indexed in the records of the real property records in the Washington County Clerk's Office. Sufficient funds were tendered by the filing attorney to the County Clerk to have the financing statement filed, both as a UCC filing, and indexed in the tract records. An agent of the County Clerk testified, and the Court finds, that there was sufficient information on the map to index the financing statement in the tract records.

There is a question under Lucas Exhibit No. "3A" as to whether such description sufficiently shows that the 31,020 feet of 4″ line, as well as the 6,600 feet of 2″ lines were described on the map. The Court finds that, if filing in Washington County alone was sufficient (which the Court finds it was not), then same was sufficient to put a creditor examining records in Washington County, Oklahoma, on inquiry notice. However, such Lucas Exhibit No. "3A" does not contain sufficient information from which a creditor could determine where the meter or dehydrator was located.

## ISSUE 1

Did the Collateral Remain Personalty Under Oklahoma Law, Thereby Requiring Central Filing for Perfection of a Security Interest

■ The threshold question in determining whether Lucas owns a perfected security interest in the pipeline is determining whether his financing statement was filed in the proper location. Determining the proper filing location hinges directly on whether Oklahoma law classifies pipeline

as a fixture. If it does, Lucas properly filed under Okla.Stat.Ann. tit. 12A, § 9–401(1)(b) (West 1961) ("§ 9–401(1)(b)") in the Washington County Clerk's Office. Otherwise, Okla.Stat.Ann. tit. 12A, § 9–401(1)(c) (West 1961) ("§ 9–401(1)(c)") provides for a central filing in the Oklahoma County Clerk's Office. As noted by two prominent commentators, "[s]ince 'fixture' is not defined in the Code, a secured party must interpret his state's case law on fixtures." White and Summers, *Uniform Commercial Code*, p. 821. *See also*, Okla. Stat.Ann. tit. 12A, § 9–313 (West 1961). Accordingly, an examination of Oklahoma case law is in order.

■ Oklahoma courts utilize the following long-established three-part test to determine whether an item may be classified as a fixture:

1. The actual or constructive annexation of the item to realty or to something appurtenant to that realty;

2. The appropriateness of the particular article's use to the purpose or actual use of the realty;

3. The intention of the party placing the article on the realty to make the article a permanent and integral part of that realty.

*Accord, Hartford Fire Ins. Co. v. Balch,* 350 P.2d 514, 516 (1960); *United Benefit Life Ins. Co. v. Norman Lumber Co.,* 484 P.2d 527, 528–530 (1971); *Gray v. Prudential Ins. Co. of America,* 182 Okla. 342, 77 P.2d 563, 564–65 (1938). The Oklahoma Supreme Court discussed this three-part test in *Kay County Gas Co. v. Bryant,* 135 Okl. 135, 276 P. 218, 222–223 (1929).

[T]he test of intention is to be given a broad and comprehensive signification. It does not merely imply the secret action of the mind of the owner of the property, nor need it be expressed in words, but is to be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made; *which obviously, suggests that the other tests are really part of this comprehensive test of intention and that they derive their chief value as conspicuous evidence of such intention.* [Emphasis added].

The Oklahoma Supreme Court further provided that the attendant circumstances must clearly show an intent to affix the article permanently to realty. Any uncertainty regarding that intent would warrant denomination as chattel. *Kay County Gas Co., supra,* at 222.

*Kay County Gas Co., supra,* focused on "[o]ne determinative question ... to wit: were the improvements [pump station and other buildings erected on the property for operation of a pipeline] a part of the realty, or were the same trade fixtures—personal property—and subject to be removed by the plaintiff". *Kay County Gas Co., supra,* at 219. The court concentrated on the actual use of the buildings on the property to reach its holding that the structures constituted chattel or trade fixtures.

It is certain that the plaintiff, who was operating the pipe line, was not interested in this 400-acre farm; that it had no interest or purpose to enhance its value ... There would seem to be no more reason for defendants to claim the warehouse and the pump house as their own than the pipe line itself. They were but necessary parts of a single enterprise, conducted for a single purpose.

*Kay County Gas Co., supra,* at 223.

■ According to the Oklahoma Supreme Court, neither the manner of attachment nor existence of an easement is solely determinative in classifying an article as a fixture. Rather, the three-part test is basically a test of intent and that test is further condensed in part by an analysis of whether the item to be classified has directly enhanced the realty. As stated in *Kay County Gas Co., supra,* at 224 "There was no thought in this case of building houses or pipe lines or pump station *to improve the 400 acre farm, or to make it a better farm".* [Emphasis added].

The court was not persuaded by the fact that the pump station owner held a long-

term easement with a right of renewal. To the contrary, it considered the existence of a long-term easement as justification for installing concrete foundations and steel framework in the buildings. *Kay County Gas Co., supra,* at 223. The holding in *Kay County Gas Co., supra,* is significant in light of the defendant's argument that the collateral is a fixture by virtue of being placed underground pursuant to an easement.

Lucas cites *Pittsburgh v. Cochran,* 159 P.2d 534 (Okla.1945) to support his characterization of the pipe as a fixture. Although *Cochran, supra,* described water mains and lateral pipe as realty (and impliedly as fixtures), the case is inapposite under the reasoning of *Kay County Gas Co., supra.* Water lines are placed on property for the express benefit of the property, while gas pipes are placed on the property to transport gas. The purpose of the former is directly tied to the land's use; the latter provides only incidental service to the land. The facts in *Cochran, supra,* bear little resemblance to the instant case.

More recently, the Oklahoma Supreme Court followed the reasoning of *Kay County Gas Co., supra,* in *Cherokee Pipeline Co. v. Newman,* 593 P.2d 90 (Okla.1979), which held that the gas pipeline was placed on the property "merely for the purpose of trade and not for the purpose of enhancing the ... property". ' *Cherokee Pipeline Co., supra,* at 92, *citing, Irwin v. Smith,* 536 P.2d 415, 419 (Okla.1975). *Cherokee Pipeline Co., supra,* characterized pipe in a similar situation as chattel and thus provides further support for classification of the collateral as trade fixtures or chattel.

Oklahoma courts have consistently characterized pipeline utilized to transport oil and gas as chattel, or more technically, as a trade fixture, which, for all purposes of filing under § 9–401, is treated as chattel. Although cases defining items as trade fixtures most often arise out of a landlord/tenant relationship, that characterization is by no means limited to this context. Items placed on realty pursuant to an easement have also been classified as trade fixtures. *See e.g., Kay County Gas Co., supra; Cherokee Pipe Line Co., supra; American Telephone & Telegraph Co. v. Muller,* 299 F.Supp. 157 (D.S.C.1968).

Lucas has argued that his permanent easement constitutes an interest in the property which he presumes makes the pipe a fixture. However, "no such presumption [that an item is a fixture] arises where the one making the addition has an estate, limited in time or use". *Muller, supra,* at 159. An easement is not a fee simple interest in the land. The easements in the instant case were intended for the purpose of laying, erecting, constructing, installing, and, thereafter, using (etc.) a gas line. The evidence indicates that Lucas would have removed the pipe upon the depletion of the gas (if economically feasible at such time) because the pipe was placed on the property "merely for the purpose of trade". The evidence did not show an intent to make the pipeline a permanent attachment to the realty.

After analyzing the evidence presented, I would characterize the pipeline as chattel for the purpose of filing the financing statement pursuant to § 9–401. The proper location for filing was the County Clerk's Office in Oklahoma County. *See, Security Nat. Bank v. Dentsply Professional,* 617 P.2d 1340, 1343 (Okla.1980); *See also,* § 9–401(1)(c).

Finally, defendant's arguments regarding trade fixtures merit attention in order to clarify the term. Although courts in Oklahoma, as well as other jurisdictions, have used the term "trade fixture" interchangeably with chattel, this appellation has confused more than clarified. A trade fixture is personalty used by a businessman in his trade to conduct business. A trade fixture is not a fixture. *See, e.g., In re Factory Home Corp.,* 333 F.Supp. 126, 130 (W.D.Ark.1971); *In re Park Corrugated Box Corp.,* 249 F.Supp. 56, 59 (D.N.J.1966). Although the term survives from pre-code days, it is a solecism—a contradiction in words—which misleads the unwary.

The defendant has argued that § 9–401 does not distinguish between "true" fixtures and trade fixtures. However, the fact that fixtures may be used for trade, or that certain fixtures may be removed from realty, does not alter the classification of the pipe in the instant case as a trade fixture or chattel. That two items share certain characteristics, such as similar affixation to realty or usage for business, does not mean that both items should be classified similarly for filing purposes. Nor does it mean that the category, trade fixture, which is treated as chattel for purposes of § 9–401, should be redefined as a fixture which is treated as realty for filing purposes under the Oklahoma UCC. Oklahoma law requires a court to examine the attendant circumstances for each item to be classified.

Although, at first glance, gas pipe would not appear to require central filing, Oklahoma law is clear as to its classification as personalty under the circumstances of this case and, thus, the necessity for central filing. Courts and commentators have consistently advised filing both locally and centrally when in doubt. *See e.g.*, White and Summers, *supra; In re Belmont Industries,* 1 B.R. 608, 613 (Bankr.E.D.Pa.1979).

### ISSUE 2

Under 11 U.S.C. § 544(a)(1), Can the Trustee Avoid the Lien Claims of Lucas in the Collateral Sale Proceeds

11 U.S.C. § 544(a)(1) provides that the trustee assume the status of a lien creditor upon the date of the debtor's bankruptcy filing. Pursuant to Okla.Stat.Ann. tit. 12A, § 9–301(1)(b) (West, 1961), the trustee, by virtue of his statutory powers as a judicial lienholder, has priority over an unperfected security interest. *See, e.g., In re Hill,* 7 B.R. 433 (Bankr.W.D.Okla.1980) (Trustee's lien status took priority over unperfected security interest); *Accord, In re Dean & Jean Fashions, Inc.,* 329 F.Supp. 663, 666 (W.D.Okla.1971) (Court voided a claim pursuant to an unperfected security interest under § 70(c) of the Bankruptcy Act, the predecessor to § 544(a)(1) of the

Bankruptcy Code). The law is well defined in this area. *See, In re Eady,* 4 B.R. 1, 3 (Bankr.N.D.Ga.1979); *In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104, 116 (Bankr. S.D.N.Y.1982); *accord, Matter of Midwestern Food Stores, Inc.,* 21 B.R. 944, 947 (Bankr.S.D.Ohio 1982); *In re Ateco Equipment, Inc.,* 17 B.R. 230, 235–36 (Bankr.W. D.Penn.1982). Courts enforce the trustee's avoidance powers over an unperfected security interest when the party claiming a security interest improperly files locally, rather than centrally. *In re Kambourelis,* 8 B.R. 138, 141 (Bankr.N.D.N.Y.1981); *Matter of Leymor Industries, Inc.,* 2 B.R. 229, 230–31 (Bankr.S.D.N.Y.1980); *In re Karachi Cab Corp.,* 21 B.R. 822, 824–825 (Bankr.S.D.N.Y.1982).

Defendant failed to perfect his security interest in the collateral on which he is claiming a lien. Accordingly, his claim to the property is inferior to the Trustee's lien under § 544(a)(1). The sale proceeds of the collateral will, therefore, inure to the estate.