In the Matter of TRIPLE A COAL COMPANY, INC. Thomas J. Rhein, Debtor.

E. Hanlin BAVELY, Trustee, Plaintiff,

v.

FT. THOMAS BELLEVUE BANK, and Mineral Associates Partnership, Ltd., Defendants,

and

PEOPLES DEPOSIT BANK, Defendant and Third Party Plaintiff,

v.

NORTHERN KENTUCKY BANK AND TRUST COMPANY, Third Party Defendant.

Bankruptcy No. 1–83–00243. Adv. No. 1–84–0136.

United States Bankruptcy Court, S.D. Ohio, W.D.

Aug. 9, 1985.

See also, Bkrtcy., 41 B.R. 641.

**808**

E. Hanlin Bavely, Cincinnati, Ohio, for plaintiff/trustee.

Clement L. Bezold, Jr., Newport, Ky., Benton, Benton & Luedeke, Newport, Ky., for defendant and third-party plaintiff, Ft. Thomas-Bellevue Bank.

Michael L. Baker, Covington, Ky., David Schneider, Covington, Ky., for defendant and third-party plaintiff, Peoples Deposit Bank.

Eugene Mooney, Lexington, Ky., for defendant and third-party plaintiff, Mineral Associates Partnership.

Richard A. Getty, Greenbaum Doll & McDonald, Lexington, Ky., Donald L. Johnson, Newport, Ky., for third-party defendant, Northern Kentucky Bank & Trust.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 7 adversary proceeding is before the Court pursuant to the May 25, 1985 trial on the merits concerning the parties' claims to money held in certain checking accounts of the debtors. The facts giving rise to these claims are largely undisputed, and revolve around intricate business dealings of debtor Thomas J. Rhein.

Prior to the February 1, 1983 filing of the above-captioned bankruptcy cases, Rhein was engaged primarily in the business of buying and selling coal. Numerous entities, both incorporated and unincorporated, were used as vehicles for this business. Many of the assets of these entities, including certain coal leases held by debtor Continuous Mining Corporation, were located in Eastern Kentucky. But the "nerve center" and chief executive office for Rhein's operation was located in Cincinnati, Ohio.

In July of 1982 Mineral Associates Partnership, Ltd. ("MAP") loaned debtor Triple A Coal Company, Inc. $850,000 as working capital under a revolving loan agreement. The money apparently was to be used to continue work on the coal mine in Kentucky. Among other things, MAP was given in exchange a security interest in all of the accounts receivable and proceeds thereof held by Rhein and his business entities. MAP thereafter took steps to perfect its security agreement by filing financing statements with the Ohio Secretary of State in Columbus, Ohio and the Hamilton County Recorder in Cincinnati, Ohio, as well as in certain counties of Kentucky where assets of the coal business were located.

Beginning in November, 1982 the relationship between MAP and Rhein deteriorated, primarily because of Rhein's spending habits and the lack of control over accounts receivable. However, the parties hammered out a new working arrangement during a two-day meeting on January 11 and 12, 1983 between Rhein and Marvin Kaulkin, a MAP partner. Kaulkin agreed that MAP would loan Rhein an additional $300,000. In order to maintain control over how it was spent, Kaulkin deposited the money into a joint checking account at the First National Bank of Cincinnati requiring the signatures of both Rhein and Kaulkin for withdrawals.

Rhein told Kaulkin that he needed some $131,707.65 by Friday, January 14, to pay bills, stating that his creditors were "beating down the door" for payment. After reviewing an itemized list of creditors to be paid (see Exhibit B attached to Pl.Ex. 4), Kaulkin agreed to advance the money requested, and left Rhein a signed blank check before returning home to Washington, D.C.

Instead of withdrawing $131,707.65 from the MAP account, Rhein made an unauthorized wire transfer of $299,900 into a checking account in his name and the name of Triple A Coal Transport located at Peoples Deposit Bank in Burlington, Kentucky. (Pl.Ex. 1, 1/19/83 to 1/31/83 bank statement; Pl.Ex. 3) These funds were commingled with other funds collected on the debtors' accounts receivable.

On the morning of January 17, 1983, Mr. Hollis Gritton, president of Peoples Deposit Bank ("Peoples"), received a telephone call from E. Andre Bussald, attorney for the Northern Kentucky Bank and Trust. According to Gritton, he was told that Rhein and individuals from Northern Kentucky Bank & Trust had met the previous day, that the parties were unable to resolve certain disputes, and that Rhein was in serious financial trouble. This information gave Gritton obvious cause for alarm, particularly since as of January 3, 1983 Rhein was in default on a $55,000 promissory note held by Peoples. Peoples also held a $92,055.60 note and security interest in certain equipment as well as a $300,000 mortgage on property located in Madison County, Kentucky. (Pl.Ex. 5) In light of these facts, on January 17 Gritton directed that a freeze be imposed on Rhein's checking account.

One day later, Gritton received a visit from Kaulkin and William Hoffman, another MAP partner, who informed him that MAP had a perfected security interest in the proceeds from Rhein's accounts receivable, and that any money in his checking account belonged to MAP. They presented him with a handwritten agreement acknowledging these facts, which Gritton refused to sign. This meeting was followed by a January 21 letter from Eugene Mooney, MAP's attorney, demanding that Peoples pay over all monies in Rhein's account. (See documents attached to MAP's Answer, Doc. 12 court file).

On January 18, 1983, Peoples accepted a deposit of $44,191.53, and the balance on the account was $73,863.05. Checks presented after January 17 were dishonored, and no additional deposits were received after January 18. On the morning of February 1, 1983, only hours before these bankruptcy cases were filed, People's offset the $55,000 owed on Rhein's promissory note against the funds remaining in his account. The other $18,863.05 in the account was offset against the balance owed on the $92,055.60 note.

A similar sequence of events transpired at the Ft.Thomas-Bellevue Bank in Kentucky. As of December 27, 1982 the Ft. Thomas-Bellevue account of the Triple A Coal Co., Inc. had a balance of $7,546.57. Between December 28, 1982 and January 21, 1983 twenty-three deposits were made into the account totalling $204,454.25. Most of this money was derived from collections on accounts receivable, but the origin of some $55,000 is unclear. Between December 28, 1982 and January 18, 1983, forty withdrawals were made totalling $195,046.65. Thus, the balance in the account as of January 24, 1983 was $16,954.17. (Pl.Ex. 2)

On January 21, 1983 MAP's attorney sent a letter to Ft. Thomas-Bellevue by certified mail, return receipt requested, informing the bank of its security interest over Triple A's accounts receivable and demanding that all money in the account be paid to MAP. (See documents attached to MAP's Answer, Doc. 12, Court file)

On January 27, 1983 Ft. Thomas-Bellevue set off the $16,954.17 in Triple A's account against $116,586.20 owed by Triple A on three promissory notes. (Pl.Exs. 2 and 6)

The claims of the parties arising out of this unique set of facts may be summarized as follows: while the trustee's complaint contains several alternative theories of recovery, he now asserts solely that the setoffs by both banks were invalid under 11 U.S.C. § 553(b)(1), since both these setoffs improved the banks' positions over the positions they held 90 days prior to bankruptcy. In other words, the amount of insufficiency (i.e., the amount the debtor owed on its promissory notes in excess of the amount in its bank accounts) on the date of the setoff was less than the amount of the insufficiency ninety days before the petition was filed. By authority of § 553(b)(1), the trustee claims that he is entitled to recover $58,616.97 from Peoples Deposit Bank and $4464.16 from Ft. Thomas-Bellevue Bank. The trustee also asserts that while both bank accounts contained money collected on accounts receivable which were

covered by MAP's security interest, those funds were commingled with other funds, including money which MAP loaned to the debtors. This commingling triggered the provisions of Ohio Revised Code § 1309.-25(D) (U.C.C. § 9–306(4)) which places specific limitations on the scope of MAP's security interest.

Both banks join in this assertion but take issue with the trustee's challenge to the right of setoff under § 553(b)(1). Further, Peoples alleges that MAP's security interest was unperfected, since it failed to follow Kentucky filing requirements alleged to be applicable in this case.

MAP disputes all of these assertions, and alleges by way of cross-claims against the banks and a counterclaim against the trustee, that because all of the funds in both accounts are traceable, its duly perfected security interest takes priority over the banks' right to setoff or the trustee's strong-arm powers under 11 U.S.C. § 544. Alternatively, MAP asserts that all of the funds held by both banks at the time of the setoffs were funds converted from the joint account of First National Bank of Cincinnati by Triple A and were held by the banks in a constructive trust for MAP's benefit.[1]

Since the resolution of these parties' claims centers largely on the validity and extent of MAP's security interest, we must first address Peoples' challenge to MAP's perfection of that interest. Peoples alleges that the Kentucky filing statute, K.R.S. § 355.9–401(1)(c) governed the means by which MAP could perfect its security interest, and that MAP's failure to file a financing statement in Campbell County, Kentucky where the debtors' resident agent, Thomas Rhein, resides, is fatal to its secured status. *See, H. Meyer Dairy Co. v. Midwestern Food Stores, Inc.,* 21 B.R. 944 (Bankr.S.D.Ohio 1982). MAP counters that

Ohio's filing statute, O.R.C. § 1309.38, governs the means of perfection of its security interest, because the security agreement was executed and its terms were to be performed in Cincinnati, Ohio, the location of debtors' chief executive offices. Under § 1309.38(E):

> the residence of an organization is its place of business if it has one or its chief executive office if it has more than one place of business.

MAP asserts that since it filed its financing statement with the Ohio Secretary of State and the Recorder's Office of Hamilton County, the location of the debtors' chief executive office, it has done all that the Ohio statute requires.

We believe that this choice of law problem is resolved by the language of K.R.S. § 355.9–103 and O.R.C. § 1309.03. The Kentucky statute, which follows the 1962 version of U.C.C. § 9–103, states that the law of the state in which debtor maintains its records or its chief place of business governs as to the validity, perfection and filing requirements for security interests over accounts, contract rights and general intangibles. K.R.S. § 355.9–103(1) and (2). The Ohio statute, which follows the 1972 version of the U.C.C., states that the law of the place where the debtor is located (i.e., its place of business or chief executive office if it has more than one place of business), governs as to accounts, general intangibles and chattel paper. O.R.C. §§ 1309.03(C)(1), (2) and (4); 1309.03(D). It is undisputed that MAP's security agreement covers, among other things, accounts receivable, general intangibles, contract rights, and chattel paper; that the records regarding those items were kept at the debtors' Cincinnati offices; and that those offices constituted the chief place of business and chief executive offices of the debt-

---

1. Peoples Deposit Bank has also filed a third party complaint against Northern Kentucky Bank & Trust Co. on guarantees issued by Northern Kentucky on certain loans made by Peoples to Rhein. Ft. Thomas-Bellevue Bank has filed a counterclaim against the trustee seeking relief from the automatic stay to pursue litigation filed in Kentucky state court wherein

it asserts a priority to the Peoples Deposit account based on an attempted attachment of that account on January 26, 1983. This attachment is also the subject of a cross-claim against Peoples. Further, Ft. Thomas-Bellevue Bank has filed a cross-claim against Northern Kentucky to collect on certain guarantees. All of these claims will be tried at a later date.

ors. *See, In re Rhein,* Case No. 1–83–00242 (Bankr.S.D.Ohio, April 14, 1983). Thus, under either the Ohio or Kentucky statute, Ohio law would govern the validity, perfection, and filing requirements for MAP's security interest. *Accord, Jesco, Inc. v. Jeffreys Steel Co., Inc.,* 571 F.Supp. 801 (N.D.Miss.1983). Having filed financing statements with both the Recorder's Office of Hamilton County and the Ohio Secretary of State, MAP was required to do nothing further in order to perfect its security interest under O.R.C. § 1309.38. (See documents attached to MAP's Amended Answer, Doc. 23 Court file.)

■ Having determined that MAP's security interest was duly perfected, we must next decide whether and to what extent that security interest is limited in scope by O.R.C. § 1309.25(D). We begin our analysis with the language of 11 U.S.C. § 552(b), which states that prepetition security agreements which extend to proceeds, products, offspring, rents or profits from property covered by the agreement continue in effect postpetition, subject to the language of the security agreement and "applicable nonbankruptcy law." While MAP's security agreement specifically extends to proceeds of collateral,[2] its postpetition right to the cash proceeds involved here is governed by O.R.C. § 1309.25(D) (U.C.C. § 9–306(4)):

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds
>
> . . . .

(2) in identifiable cash proceeds in the form of money *which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;*

(3) in identifiable cash proceeds in the form of checks and the like *which are not deposited in a deposit account prior to insolvency proceedings;* and

(4) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this division is:

> (a) subject to any right of set-off; and
>
> (b) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings, less the sum of (i) the payments to the secured party on account of cash proceeds received by the debtor; and (ii) the cash proceeds received by the debtor during such period to which the secured party is entitled under division (D)(1) to (3) of this section.[3] (emphasis added.)

A fair reading of this section reveals that once cash proceeds are *either* commingled with other funds *or* deposited into a deposit account, they cease to be "identifiable," (i.e., traceable), and the secured creditor's postpetition right to trace those funds ceases to exist. The secured creditor's sole right to recover proceeds is then governed by O.R.C. § 1309.25(D)(4), which sets forth a formula for determining the creditor's right to recovery from the bank account. As was stated in *In re Cooper,* 2 B.R. 188, 196 (Bankr.S.D.Tex.1980):

---

**2.** O.R.C. § 1309.25(A) (U.C.C. § 9–306(1)) defines proceeds as "whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds.... Moneys, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'non-cash proceeds'." Even if MAP's security agreement had not specifically listed proceeds of collateral, its security interest would automatically extend to proceeds by operation of § 1309.14(C) (U.C.C. § 9–203(3)), which reads as follows:

> Unless otherwise agreed, a security agreement gives the secured party the rights to proceeds

provided by section 1309.25 of the Revised Code.

**3.** These cases were commenced on February 1, 1983 with the filing of Chapter 11 petitions. They were subsequently converted to Chapter 7 liquidations. Proceedings under either chapter would qualify as "insolvency proceedings" as defined in O.R.C. § 1301.01(V) (U.C.C. § 1–201(22)). *In re Conklin's, Inc.,* 14 B.R. 318, 320 (Bankr.D.S.C.1981).

This formula is apparently in lieu of the right to trace and limits any right the secured creditor would have had in non-Code situations to trace proceeds by any means available.

*See also, In re Jameson's Foods, Inc.,* 35 B.R. 433, 437–440 (Bankr.D.S.C.1983); *In re Critiques, Inc.,* 29 B.R. 941, 945 (Bankr. D.Kan.1983); J. White & R. Summers, *Uniform Commercial Code* 1013 (2d ed. 1980); 1A P. Coogan, W. Hogan, D. Vagts, J. McDonnell *Secured Transactions Under the Uniform Commercial Code* (Matthew Bender) § 7.11A[2][p] at 7AA–68 (1985); Balloun, *Right of Secured Party to Recover Proceeds Commingled in Debtor's Bank Account,* 28 Kan.L.Rev. 325, 327 (1980).

■ It is undisputed that the proceeds from debtors' accounts receivable were commingled with other funds, and that the money was deposited into a general "deposit account" as defined in O.R.C. § 1309.-01(A)(5) (9–105(1)(e))[4]. Thus, MAP may only recover cash proceeds to the extent allowable under § 1309.25(D)(4). The first qualifying phrase of that section squarely presents the issue of the banks' right of setoff. One commentator has noted, and we agree, that

> section 9–306(4)(d)(i) of the UCC, which subjects the secured creditor's interest in a commingled account in bankruptcy proceedings to "any right of set-off" does not create any new right of setoff but involves any right of setoff otherwise available under state law.

TeSelle, *Banker's Right of Setoff,* 34 Okl. L.Rev. 40, 71 (1981). State law also governs a creditor's prepetition right to setoff as preserved in 11 U.S.C. § 553. *See, United States v. Norton,* 717 F.2d 767, 772 (3rd Cir.1983); *In re Saugus General Hospital, Inc.,* 698 F.2d 42, 44 (1st Cir.1983).

■ State law on the question of a bank's right to set off funds in which third

parties have an interest may be divided into two main lines of authority:

> Under the majority rule a bank may set off the general deposit of a debtor, even though a third party has an interest in the funds, if the bank has no knowledge of the third party's interest nor knowledge of sufficient facts to put the bank on inquiry notice as to such facts....
>
> Under the equitable rule, a bank may not set-off funds in which a third party has an interest, regardless of the bank's lack of knowledge, unless the bank has changed its position to its detriment or has acquired superior equities in reliance on the depositor's apparent sole ownership.

TeSelle, *Banker's Right To Setoff,* 34 Okl. L.Rev. 40, 71–72 (1981). Kentucky appears to follow the majority rule (*First National Bank v. Barger,* 115 S.W. 726 (Ky.1909)), while Ohio follows the equitable rule (*Kull v. North High Saving & Loan Co.,* 21 Ohio L.Abs. 172, 176 (Ohio Ct.App.1935)).

■ We conclude that both Peoples and Ft. Thomas-Bellevue were precluded from setting off the debtors' accounts under either rule. While there is no evidence that either bank was aware that Rhein had wrongfully withdrawn the $299,900 from the joint account at the First National Bank and deposited the money into the account at Peoples, both were clearly aware that MAP claimed a perfected security interest in proceeds from accounts receivable. Peoples knew of this potential claim against the money in Rhein's account as early as January 18, 1983, when it met with Kaulkin and Hoffman. Both banks received unequivocal written notice of the claim by way of MAP's January 21, 1983 letter. The effectuation of a setoff in the face of such notice was prohibited under Kentucky law. Even if neither had received notice of MAP's claim, the setoffs were equally invalid under Ohio law, since neither bank

---

**4.** That section reads as follows:

"Deposit account" means a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit.

could claim any equitable interest in the money superior to MAP's. *Fayen v. Cleveland Trust Co.*, 23 Ohio Op. 563, 569 (Common Pleas Ct.1942); *see also, In re Property Leasing & Management, Inc.*, 46 B.R. 903, 908–09 (Bankr.E.D.Tenn.1985); Annot., 8 A.L.R.3d 235, (1966); Annot., 3 A.L.R. 4th 998 (1981).

 While MAP's security interest was not subject to a valid right of setoff by the banks, nonetheless MAP is precluded from recovering any of the funds in the deposit accounts under 1309.25(D)(4)(b), since no cash proceeds were deposited in the accounts within the ten days preceeding the February 1 filing of the Chapter 11 petition. *In re Critiques, Inc.*, 29 B.R. 941, 946 (Bankr.D.Kan.1983); *In re Conklin's, Inc.*, 14 B.R. 318, 320 (Bankr.D.S.C.1981).

 Under a different set of facts, we would conclude that since neither the banks nor MAP could assert a right to the money in the accounts, the trustee was entitled to all of it.[5] However, the egregious and exceptional circumstances presented in this case lend some support to MAP's constructive trust theory. In essence, MAP argues that some $168,000 of the $299,900 which Rhein transferred into his Peoples Deposit account was obtained by fraud, and that under state law a constructive trust should be imposed in favor of MAP as to the money held by both Peoples and Ft. Thomas-Bellevue.

Under this theory, the money never becomes a part of the bankruptcy estate. The beneficiary's equitable right to it under 11 U.S.C. § 541(d) prevails over the bankruptcy trustee's strong-arm powers under 11 U.S.C. § 544, since the trustee holds only legal title to the money. As was noted in *In re Quality Holstein Leasing*, 752 F.2d 1009, 1013–14 (5th Cir.1985):

Where state law impresses property that a debtor holds with a constructive trust in favor of another, and the trust attaches prior to the petition date, the trust beneficiary normally may recover its eq-
uitable interest in the property through bankruptcy court proceedings.

*See also, In re Flight Transportation Corp. Securities Litigation*, 730 F.2d 1128, 1136 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1984); *In re Teltronics, Ltd.*, 649 F.2d 1236, 1239 (7th Cir.1981); *In re Shepard*, 29 B.R. 928 (Bankr.M.D.Fla.1983); *cf., Knight Newspapers, Inc. v. Commissioner*, 143 F.2d 1007, 1011 (6th Cir.1944).

The courts of both Ohio and Kentucky have described the concept of a constructive trust essentially in the following terms:

The constructive trust may be defined as a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. When a court of equity finds that a defendant is the holder of a property interest which he retains by reason of unjust, unconscionable or unlawful means, it takes such interest from the defendant and vests it in the wronged party.

G. Bogert and G. Bogert, The Law of Trusts and Trustees § 471 at 3 (2d ed. 978).

While the remedy is usually imposed in cases of fraud or unjust enrichment, it may be imposed for any reason recognized in equity, including mistake of fact. *Ferguson v. Owens*, 9 Ohio St.3d 223, 226, 459 N.E.2d 1293 (1984); *see also, In re Hurricane Elkhorn Coal Corp. II*, 32 B.R. 737 (W.D.Ky.1983), *aff'd.*, 763 F.2d 188 (6th Cir.1985) (constructive trust imposed where bank was mistakenly paid too much money); *Ferguson v. Deuble*, 27 O.L.A. 533 (1938) (constructive trust imposed on bank account where defendant induced plaintiff to sign card making defendant a joint owner of account, even though plaintiff established little more than a unilateral mistake).

It is equally settled law in both Ohio and Kentucky that a constructive trust will fol-

---

**5.** Since we have found that the banks were precluded from exercising any setoff rights to the money, we need not address the trustee's
contention that the banks improved their position under 11 U.S.C. § 553(b)(1).

low funds into a bank account. *See, In re Hurricane Elkhorn Coal Corp. II, supra; Ferguson v. Deuble, supra; Steiner v. Fecycz*, 72 Ohio App. 18, 50 N.E.2d 617 (1942). Where trust funds have been commingled with other funds held by the wrongdoer, the claimant need only trace the money into the commingler's account in order to impress the funds with a constructive trust. Any withdrawals made from the commingled account are presumed to have been made from the non-trust funds first. *In re Hurricane Elkhorn Coal Corp. II, supra,* at 741; *Stanley v. Kreinbihl*, 152 Ohio St. 315, 324, 89 N.E.2d 593 (1949); *Smith v. Fuller*, 86 Ohio St. 57, 68, 99 N.E. 214 (1912).

When these principles are applied to the undisputed evidence in this case, it is apparent that MAP is entitled to have a constructive trust imposed on the money which Peoples Deposit wrongfully set off from Rhein's account. While Kaulkin may have acted imprudently in giving a blank check to Rhein, particularly in light of their past dealings, we do not doubt his testimony that he did so on the basis of Rhein's misrepresentations. Even if fraud were not strictly apparent from this record, it would be clearly inequitable to allow the trustee and the creditors to profit from Rhein's wrongful deposit and retention of MAP's money in the Peoples account.

While MAP has met the tracing requirements of the constructive trust doctrine as to the Peoples account, there is no clear evidence that any of the $299,900 was ever transferred into the Ft. Thomas-Bellevue account. Absent such evidence, we conclude that the trustee is entitled to the money which Ft. Thomas-Bellevue wrongfully set off, pursuant to 11 U.S.C. § 544.

For the reasons stated above, judgment will be entered in favor of MAP and against Peoples Deposit Bank in the amount of $73,863.05; judgment will be entered in favor of the trustee and against Ft. Thomas-Bellevue in the amount of $16,954.17. The remainder of the parties' claims considered herein shall be dismissed. The foregoing shall constitute this Court's findings of fact, opinion and conclusions of law.

IT IS SO ORDERED.